**Lillian Virginia SIMMONS, Appellant,**

v.

**Joan FABIAN, Commissioner of Corrections, in her Official and Individual Capacities, Respondent.**

No. A06–2308.

Court of Appeals of Minnesota.

Dec. 31, 2007.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, Kelly S. Kemp, Assistant Attorney General, St. Paul, MN, for respondent.

Considered and decided by PETERSON, Presiding Judge; WILLIS, Judge; and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

Appellant challenges an order dismissing her complaint, arguing that the district court erred by ruling that respondent was entitled to absolute quasi-judicial immunity from her 42 U.S.C. § 1983 claim seeking injunctive relief.  We reverse and remand.

## FACTS

Appellant Lillian Simmons is currently serving an indeterminate life sentence based on a 1989 conviction of first-degree felony murder, a violation of Minn.Stat. § 609.185(3) (1988).[1] Under the law in effect when she was convicted, Simmons was eligible for parole after serving 17 years of her sentence. *See* Minn.Stat. § 244.05, subd. 4 (1988). Respondent Joan Fabian is the Minnesota Commissioner of Corrections, the executive-branch official ultimately responsible for parole decisions in the state.

In March 2003, the commissioner met with an advisory panel to review Simmons's file and establish a projected release date. Although Simmons was eligible for parole in October 2006, the commissioner continued review of her file until 2010. She explained her decision in a letter to Simmons:

> As you may know, no life-sentenced inmate now gets out at their minimum parole eligibility date, since the purposeful taking-of-a-life requires more than minimum accountability time. Even if an inmate's prison discipline record is perfectly clean, which yours is not, and they have done everything they can to prepare themselves for release, which you have been striving to do, there will still be [a] number of years beyond their minimum to serve before release is considered.

Simmons brought an action against the commissioner in both her official and individual capacities under 42 U.S.C. § 1983, alleging that this decision effectively denied Simmons a formal parole hearing in violation of the Due Process Clause of the Fourteenth Amendment because it was based on an indiscriminate, blanket policy rather than a complete review of her file.[2] Simmons sought injunctive relief compelling the commissioner to hold a new hearing in which the commissioner would be required to "[e]xercise her discretion in a fair manner ... including review[ing] and consider[ing] [Simmons's] entire case file and all expert reports contained therein." Simmons also sought a declaratory judgment that the commissioner violated Simmons's constitutional rights, along with attorney fees and costs under 42 U.S.C. § 1988.

The commissioner moved to dismiss the complaint, arguing that, as the commissioner of corrections, she is entitled to absolute quasi-judicial immunity in her parole decision-making capacity. The district court granted the commissioner's motion, and this appeal followed.

## ISSUE

Is the commissioner of corrections entitled to absolute quasi-judicial immunity from lawsuits for injunctive relief under 42 U.S.C. § 1983, as amended by the Federal Courts Improvement Act of 1996, based on allegedly unconstitutional decision-making in that capacity?

## ANALYSIS

■ Title 42 U.S.C. § 1983 provides a cause of action against a state official who,

---

1. The Minnesota Supreme Court affirmed the conviction and remanded on another issue in *Dunn v. State,* 486 N.W.2d 428 (Minn.1992). *See also Dunn v. State,* 499 N.W.2d 37 (Minn. 1993) (affirming appeal following remand); *Dunn v. State,* 578 N.W.2d 351 (Minn.1998) (affirming summary denial of third petition for postconviction relief). Since that time, appellant has legally changed her surname to Simmons.

2. Simmons also claimed that the commissioner's decision violated the Ex Post Facto Clause. The district court dismissed this claim for failure to establish an ex post facto violation. Simmons does not challenge this ruling on appeal.

acting under color of law, deprives a person of a federal constitutional or statutory right. *Wyatt v. Cole,* 504 U.S. 158, 163–64, 112 S.Ct. 1827, 1831–32, 118 L.Ed.2d 504 (1992). We note at the outset that whether an official is entitled to immunity in a state court proceeding alleging a violation of section 1983 is governed by federal, not state, immunity doctrine. *Finch v. Wemlinger,* 310 N.W.2d 66, 70 (Minn.1981). And whether a public official is entitled to absolute immunity under federal law presents a question of law, which we review de novo. *Johnson v. State,* 553 N.W.2d 40, 45 (Minn.1996); *Elwood v. Rice County,* 423 N.W.2d 671, 675 (Minn.1988). In doing so, we analyze this question independent of the merits of the underlying action. *Johnson,* 553 N.W.2d at 45; *Elwood,* 423 N.W.2d at 675. An official claiming immunity bears the burden of establishing entitlement to it. *Finch,* 310 N.W.2d at 70.

The commissioner asserts that she is entitled to absolute quasi-judicial immunity because her official decision-making functions in the parole process are essentially adjudicatory in nature and are integral to the judicial sentencing function. Had this lawsuit been an action for damages, we would agree. *See Figg v. Russell,* 433 F.3d 593, 598 (8th Cir.2006) (holding that parole-board members are absolutely immune from damages based on quasi-judicial function). But Simmons is seeking an injunction, and "immunity from damages does not ordinarily bar equitable relief as well." *Wood v. Strickland,* 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975).

Whether the commissioner of corrections is entitled to quasi-judicial immunity in an action for injunctive relief under 42 U.S.C. § 1983, as amended by the Federal Courts Improvement Act of 1996 (FCIA) is an issue of first impression in Minnesota. Before 1996, it was clear that even sitting judges were not immune from lawsuits for injunctive relief under section 1983. *See Pulliam v. Allen,* 466 U.S. 522, 540, 104 S.Ct. 1970, 1980, 80 L.Ed.2d 565 (1984) (holding that judicial immunity from damages did not extend to equitable relief). The FCIA, however, substantially restricted the availability of injunctive relief against a "judicial officer for an act or omission taken in such officer's judicial capacity." Federal Courts Improvement Act of 1996, Pub.L. No. 104–317, § 309(c), 110 Stat. 3847 (1996) (codified as amended in 42 U.S.C. § 1983 (2000)). Because section 1983 does not define the term "judicial officer," it is disputable whether this "new restriction on the granting of injunctive relief against 'judicial officers' was meant to extend to other officials whose entitlement to absolute immunity from damages had been recognized in light of their roles in judicial proceedings." *Hili v. Sciarrotta,* 140 F.3d 210, 215 (2d Cir.1998). In light of the plain language, legislative history, and purpose of section 1983, including the FCIA, we conclude that section 1983 does not protect the commissioner from lawsuits seeking injunctive relief.

## I.

▮ When Congress enacted the Civil Rights Act of 1871, it intended "to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 660, 98 S.Ct. 2018, 2020, 56 L.Ed.2d 611 (1978). To this end, section 1 of the act, which is codified at 42 U.S.C. § 1983, created an action designed to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt,* 504 U.S. at 161, 112 S.Ct. at 1830. And although the language of this section permits a plaintiff to sue "every person" who deprives the plaintiff of a

federal right "under color of law," section 1983 also must be construed in light of the common-law background against which it was enacted. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709, 119 S.Ct. 1624, 1638, 143 L.Ed.2d 882 (1999). This includes common-law immunity defenses. *Id.* at 728, 119 S.Ct. at 1648.

■■ The various common-law doctrines of official immunity embody a recognition that "[s]pecial problems arise … when government officials are exposed to liability for damages." *Forrester v. White*, 484 U.S. 219, 223, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). For example, the threat of liability "can create perverse incentives that operate to *inhibit* officials in the proper performance of their duties." *Id.* If those who may be adversely affected by a government official's decisions can sue that official, the threat of personal financial loss may induce government officials "to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct." *Id.*

■■ Yet there is an "undeniable tension" between ensuring that an official is free to fearlessly serve the public and granting a license to disregard the consequences of the official's actions. *Id.* at 223–24, 108 S.Ct. at 542. After all, a governing principle of our constitutional democracy is that "[a]ll the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978) (quotation omitted). Although the primary purpose of immunity is to protect the public's interest in fearless decision-making by its officials, the fear of personal liability for wrongful conduct encourages officials "to carry out their duties in a lawful and appropriate manner[.]" *Forrester*, 484 U.S. at 223, 108 S.Ct. at 542. Therefore, the law "has been cautious in recognizing claims that government officials should be free of the obligation to answer for their actions in court." *Id.* at 223–24, 108 S.Ct. at 542.

■ This tension factors not only into our analysis of whether to extend immunity, but also into the nature of the immunity the law is willing to extend. The United States Supreme Court has recognized two levels of immunity in section 1983 claims. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993). Qualified immunity, the most common variety, protects officials so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* By focusing on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law," the test for qualified immunity is intended both to avoid excessively disrupting government functioning and to deter unlawful conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). And in most cases, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478, 494–95, 111 S.Ct. 1934, 1944, 114 L.Ed.2d 547 (1991) (quotation omitted).

■ In contrast, absolute immunity *always* protects an official's acts from personal liability from damages, even if the official should have known that the acts clearly violated the plaintiff's rights. *See Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976) (noting that absolute immunity automatically "defeats a suit at the outset, so

long as the official's actions were within the scope of the immunity"). Unlike qualified immunity, which focuses on the reasonableness of the act that allegedly violated the plaintiff's rights, absolute immunity focuses on the nature of the governmental function that the official was performing. *Burns,* 500 U.S. at 486, 111 S.Ct. at 1939. Absolute immunity reflects a recognition that the particularly sensitive nature of performing certain duties makes it "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id.* (quotation omitted).

The Supreme Court has been "quite sparing" in recognizing entitlement to absolute immunity and typically refuses "to extend it any further than its justification would warrant." *Id.* at 487, 111 S.Ct. at 1939 (quotations omitted). Therefore, qualified, not absolute, immunity is presumed to be sufficient protection for most government officials; the "strong medicine" of absolute immunity is justified only when the mere possibility of liability poses a "very great" danger to officials performing their duties effectively. *Forrester,* 484 U.S. at 230, 108 S.Ct. at 545 (quoting *Forrester v. White,* 792 F.2d 647, 660 (7th Cir.1986) (Posner, J., dissenting)).

Absolute judicial immunity from damages is one of the most "solidly established" immunities in the common law. *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967); *see also Pulliam,* 466 U.S. at 530–36, 104 S.Ct. at 1974–78 (discussing historical development of doctrine). The judicial function is particularly vulnerable to the threat of litigation. A judge's "errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation." *Pierson,* 386 U.S. at 554, 87 S.Ct. at 1218. To promote the public interest in an impartial judiciary free to engage in "principled and fearless decisionmaking," the federal common law developed a rule that protects judges from liability for damages resulting from their judicial acts. *Id.*

However, because the threat of injunctive relief raises different concerns from those justifying immunity from damages awards, "there is little support in the common law for a rule of judicial immunity that prevents injunctive relief against a judge." *Pulliam,* 466 U.S. at 540, 104 S.Ct. at 1980. Whereas liability for damages would require a judge to *pay,* an injunction forces a judge to *act.* The threat of injunctive relief does not create "perverse incentives" for a judge to decide a case in a way that will avoid risking pecuniary consequences. *See Forrester,* 484 U.S. at 223, 108 S.Ct. at 542 (noting fear of monetary damages as primary threat to officials' discretion justifying immunity). Moreover, the built-in limitations on the availability of equitable relief already "severely curtail the risk that judges will be harassed and their independence compromised by the threat of having to defend themselves against suits by disgruntled litigants." *Pulliam,* 466 U.S. at 537–38, 104 S.Ct. at 1978–79. Indeed, before obtaining equitable relief against *any* defendant, a litigant must establish both the absence of an adequate remedy at law and a serious risk of irreparable harm. *Id.* at 537, 104 S.Ct. at 1978. For these reasons, the *Pulliam* Court held that common-law absolute judicial immunity did not preclude injunctive relief or attorney fees awards under section 1983. *Id.* at 541–42, 104 S.Ct. at 1981.

The above analysis is equally applicable to "quasi-judicial" immunity, which is derived from common-law judicial immunity and applies to government offi-

cials who "perform functions closely associated with the judicial process." *Cleavinger v. Saxner*, 474 U.S. 193, 200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985); *see Imbler*, 424 U.S. at 423, 96 S.Ct. at 991 (noting same concerns underlying common-law basis for immunity). Because absolute immunity should not be extended "any further than its justification would warrant," the law takes a "functional approach" to determine whether "the nature of the responsibilities of the individual official" creates one of "those exceptional situations where ... absolute immunity is essential for the conduct of the public business[.]" *Burns*, 500 U.S. at 486–87, 111 S.Ct. at 1939 (quotation omitted); *Cleavinger*, 474 U.S. at 201, 106 S.Ct. at 500–01 (quotations omitted).[3] The Supreme Court has recognized that absolute quasi-judicial immunity from damages awards is warranted for federal hearing examiners, administrative law judges, witnesses, grand jurors, and prosecutors. *Cleavinger*, 474 U.S. at 200, 202, 106 S.Ct. at 500, 501.

▮▮ Just as the federal common law did not immunize judges against injunctive relief, it also did not immunize quasi-judicial officials against such relief. For example, although prosecutors are entitled to absolute "quasi-judicial" immunity against damages claims, they are not immune from, and in fact have historically been subject to, actions for injunctive relief to prevent the enforcement of unconstitution-al criminal laws. *See Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736–37, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980) (observing that prosecutors are "natural targets" for lawsuits enjoining them from bringing criminal charges on constitutional grounds). Such an injunction does not interfere with a prosecutor's general discretion because the prosecutor "is simply prohibited from doing an act which [the prosecutor] had no legal right to do." *Ex parte Young*, 209 U.S. 123, 159, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908).

Prior to 1996, federal common law is clear as to the lack of absolute judicial or "quasi-judicial" immunity from claims for injunctive relief under section 1983. Thus, even assuming, without deciding, that the commissioner is entitled to absolute quasi-judicial immunity from damages claims, *see Figg*, 433 F.3d at 598, she nevertheless is subject to claims for injunctive relief unless she falls within the class of "judicial officers" granted absolute immunity by the FCIA. Without addressing the scope of the FCIA, the district court held that the commissioner was entitled to absolute immunity from both damages, which were not sought, and injunctive relief. To the extent that the district court's decision reflects a conclusion that absolute quasi-judicial immunity from injunctive relief under section 1983 is available without the benefit of the FCIA, that decision is without legal support.[4]

---

**3.** Some factors to consider in determining whether absolute quasi-judicial immunity from damages awards is warranted include (1) the severity of the threat of liability on the official's ability to perform the functions without harassment or intimidation; (2) whether there are already safeguards that reduce the need for private damages actions as a method of controlling unconstitutional conduct; (3) the degree to which the official is insulated from political influence; (4) the importance of precedent to the official's decision-making; (5) the adversary nature of the process; and (6) the correctability of the official's error on appeal. *Cleavinger*, 474 U.S. at 202, 106 S.Ct. at 501 (citing *Butz*, 438 U.S. at 512, 98 S.Ct. at 2913).

**4.** Minnesota law may provide a basis for quasi-judicial immunity from injunctive relief on state-law claims. *See, e.g., Tindell v. Rogosheske*, 428 N.W.2d 386, 387 (Minn.1988) (guardians ad litem). But section 1983 immunity doctrine does not govern state immunity doctrine nor does state immunity law

## II.

In 1996, Congress responded to the *Pulliam* Court's holding that federal common-law judicial immunity did not bar awarding injunctive relief or attorney fees against "a judicial officer acting in her judicial capacity" by enacting the FCIA. S. Rep. 104–366, at 36–37 (1996). The FCIA placed a substantial restriction on the availability of equitable relief under section 1983 claims against a "judicial officer for an act or omission taken in such officer's judicial capacity." Pub.L. No. 104–317, § 309(c), 110 Stat. 3847. We now must decide whether the restriction enacted in the FCIA protects the commissioner by granting immunity from claims seeking injunctive relief. Although section 1983 continues to permit a "suit in equity" against "[e]very person" who deprives another of a federal right under color of law, after the enactment of the FCIA, section 1983 now also provides:

> [I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

According to the Senate Judiciary Committee Report, this new language was intended to "restore[ ] the doctrine of judicial immunity to the status it occupied prior to the Supreme Court's decision in [*Pulliam* ]," which the committee concluded "broke with 400 years of common-law tradition and weakened judicial immunity protections." S. Rep. 104–366, at 36.

There is very little caselaw addressing the issue before us—whether the new restriction on granting injunctive relief against "judicial officers" extends to other officials who are entitled to absolute immunity from damages because of their role in govern section 1983 immunity doctrine. *El-*

judicial proceedings. *See Hili*, 140 F.3d at 215 (noting uncertainty on issue). And we acknowledge that the scant caselaw that exists reaches a conclusion contrary to ours. In *Montero v. Travis*, for example, the Second Circuit applied the FCIA to protect the New York parole-board commissioner from injunctive relief. 171 F.3d 757, 761 (1999). The plaintiff in *Montero* was arrested for allegedly violating a condition of his parole four days after his release. *Id.* at 759. As a result of the parole violation, the commissioner resentenced the plaintiff to six years in prison. *Id.* The plaintiff brought a section 1983 action alleging that the commissioner violated his due-process rights by presiding over the parole-revocation hearing despite preexisting bias. *Id.* The relief sought by the plaintiff included both damages and an injunction prohibiting the commissioner from retaliating against him for filing suit. *Id.* The *Montero* court summarily concluded that "[a]bsolute immunity bars not only [the plaintiff's section] 1983 claim for damages but also his claim for injunctive relief" against parole officials "when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Id.* at 761 (citing Pub.L. No. 104–317, § 309(c), 110 Stat. 3847).

In *Roth v. King*, the District of Columbia Circuit applied the FCIA and found public-defender administrators immune from injunctive relief when selecting court-appointed attorneys in juvenile-delinquency cases. 449 F.3d 1272, 1286–87 (D.C.Cir. 2006). The administrators were statutorily required to both "assist the court in determining the financial eligibility for appointed representation" and "establish and coordinate the operation of an adequate system of private attorneys to represent [indigent] persons." *Id.* at 1287 (quotation omitted). A group of lawyers brought a *wood*, 423 N.W.2d at 677.

section 1983 action against, among others, administrators in a family-law division of the District of Columbia public defender's office. *Id.* at 1276. The plaintiffs alleged that changes in the system for appointing attorneys in delinquency cases deprived them of their property right "to receive paid Family Court appointments" without due process and sought to enjoin the administrators from enforcing the new system of appointment. *Id.* at 1278. The *Roth* court held that the administrators were entitled to absolute immunity from injunctive relief based on their statutory role in the appointment process. *Id.* at 1287. The court reasoned that section 1983 as amended by the FCIA "explicitly immunizes judicial officers against suits for injunctive relief," and that "[i]t is well established that judicial immunity extends to other officers of government whose duties are related to the judicial process." *Id.* at 1286–87 (quotation omitted). The *Roth* court concluded that "[t]here is also no reason to believe that the [FCIA] is restricted to 'judges.'" *Id.* at 1287. We respectfully disagree.[5] Indeed, our application of United States Supreme Court precedent construing section 1983 and our analysis of the legislative history of the FCIA provide ample reasons to conclude that immunity from injunctive relief enacted in the FCIA is indeed restricted to "judges."

The interpretive approach taken by *Montero* and *Roth* is inconsistent with the applicable Supreme Court precedent construing section 1983. It is axiomatic that we must construe section 1983 "generously to further its primary purpose" of "provid[ing] a remedy ... against all forms of official violation of federally protected rights." *Monell,* 436 U.S. at 700–01, 98 S.Ct. at 2041 (noting primary purpose to provide remedy against state officials); *Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980) (noting that section 1983 should be broadly construed as remedial statute). Even when the plaintiff is seeking monetary damages, immunity for state officers is the exception, not the rule. *See Gomez,* 446 U.S. at 639, 100 S.Ct. at 1923 (describing willingness to extend immunity under "certain limited circumstances"). We must presume that, by using the broad language of section 1983 to reach "every" state official, Congress affirmatively intended to abrogate "every" state official's immunity unless a particular immunity is so well-settled and compatible with Congress's goals in enacting section 1983 that Congress can be presumed to have thought otherwise. *Cf. id.* (unwilling to infer congressional intention to abrogate immunities that were both well established at common law and compatible with purposes of Civil Rights Act); *Owen v. City of Independence,* 445 U.S. 622, 635–36, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980) (noting that "expansive sweep of the statutory language" was intentional); *Gomez,* 446 U.S. at 639, 100 S.Ct. at 1923.

There is no indication that Congress intended the FCIA to undermine its original goal for the Civil Rights Act of 1871. Congress did not purport to change the fact that section 1983 is a remedial statute specifically designed to provide plaintiffs with a broad remedy against state officials who violate their federal rights. The language of the FCIA restricting the availability of this remedy "in any action [for injunctive relief] brought against a judicial

---

**5.** Although the opinions of these federal courts "are persuasive and should be afforded due deference," we are bound only by decisions of the Minnesota Supreme Court and the United States Supreme Court, even when interpreting federal statutes. *Citizens for a Balanced City v. Plymouth Congregational Church,* 672 N.W.2d 13, 20 (Minn.App.2003).

officer," therefore, must be interpreted narrowly. *See District of Columbia v. Carter*, 409 U.S. 418, 432–33, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973) (quotation omitted) (discussing construction of section 1983). "We are not at liberty to seek ingenious analytical instruments to avoid giving a congressional enactment the broad scope its language and origins may require." *Id.* Without a reason to conclude that the FCIA affirmatively intended the term "judicial officer" to restrict the availability of injunctive relief beyond official members of the judiciary, we decline to "recast this [amended] statute to expand its application beyond the limited reach Congress gave it." *See id.* (quotation omitted).

Furthermore, our review of the legislative history establishes that Congress did not even consider the possibility that it would be amending section 1983 to restrict the availability of injunctive relief against quasi-judicial officers. Section 309 of the FCIA followed a number of virtually identical bills that never reached a final vote. *See* S. Rep. 104–366, at 36 (listing previous versions). Congress first addressed the subject matter in 1985, when it conducted hearings on "the immunity issues raised by *Pulliam.*" Judicial Immunity Restoration Act, S. Rep. 102–224, at 2 (1991). The Senate Subcommittee on the Constitution produced a bill that would have given judges personal immunity from attorney-fee awards under 42 U.S.C. § 1988, but it was never considered by the Senate Judiciary Committee. *Id.* at 2–3. It was not until three years later that the Senate Judiciary Committee actually considered a bill that prohibited damages or injunctive relief against a "judicial officer for action taken in a judicial capacity." *Id.* at 3. This bill, however, was never considered by the full Senate. *Id.* The 1989 and later versions contained substantially the same text as the one finally enacted in

1996. *Id.* at 3–4. Whether in the language of these bills, the accompanying committee reports, or the introductory remarks on the floor, the history of the legislation that ultimately was enacted in 1996 is entirely consistent in at least three important respects.

First, it is clear that Congress was specifically addressing the Supreme Court's decision in *Pulliam* when it amended section 1983. S. Rep. 104–366, at 37 (referring to language in FCIA as designed "specifically [to] address the statutes at issue in *Pulliam* "). And language substantially identical to "this legislation is to restore judicial immunity to its pre-*Pulliam* status" can be found in nearly every iteration of the bill. *See, e.g.,* S. Rep. 104–366, at 36 (FCIA); 141 Cong. Rec. S11324–01 (1995) (Judicial Immunity Restoration Act); S. Rep. 102–224, at 1–2 (1991) (Judicial Immunity Restoration Act); S. Rep. 101–465, at 1 (1990) (Judicial Immunity Restoration Act); 135 Cong. Rec. S2630–01, at S2705 (1989) (judicial immunity bill); 134 Cong. Rec. S3802–01 (1988) (Joint Resolution of Virginia Legislature to Senate Committee on the Judiciary); 131 Cong. Rec. E304–02 (extended remarks of sponsor).

Furthermore, this legislation was originally introduced because Congress was concerned that *Pulliam's* holding that judicial immunity did not bar attorney fees under 42 U.S.C. § 1988 would have the same impact on traditional judicial independence as awarding damages. *See, e.g.,* 134 Cong. Rec. S3802–01 (1988) (Joint Resolution of Virginia Legislature to Senate Committee on the Judiciary) (supporting legislation prohibiting "award of attorney's fees against judges arising out of actions for injunctive relief" because "the consequences of such liability on the independence of state judicial decisions cannot but exert an intimidating influence on the

free and unbiased functioning of even the most courageous judge"). Indeed, the earliest proposed legislation traceable to section 309 of the FCIA specifically avoided any restrictions on injunctive relief; and Congress did not address injunctive relief until three years later.[6] 131 Cong. Rec. E304–02 (1985); S. Rep. 102–224, at 3. According to the report accompanying the 1991 version, *Pulliam* created a "critical" problem "for the independence of the judiciary" if a plaintiff can collect section 1988 attorney fees after successfully getting injunctive relief under section 1983, "mak[ing] judges personally liable for court costs and large attorney fee awards that are tantamount to direct money damages and thereby encourag[ing] harassing litigation." S. Rep. 102–224, at 7. Likewise, the FCIA specifically refers to the effect *Pulliam* has on individual judges:

> Even when [frivolous suits for injunctive relief] are routinely dismissed, the very process of defending against those actions is vexatious and subjects judges to undue expense. More importantly, the risk to judges of burdensome litigation creates a chilling effect that threatens judicial independence and may impair the day-to-day decisions of the judiciary in close or controversial cases.

S. Rep. 104–366, at 37.

Second, Congress restricted injunctive relief against "judicial officers" because it was concerned that dissatisfied state-court litigants would erode traditional principles of comity by using section 1983 to collaterally attack unfavorable judgments in federal court. By introducing the first bill equivalent to the FCIA, the sponsors specifically referred to the problem the legislation was addressing by restricting injunctive relief against "judicial officers" in section 1983 actions. Senator Hefflin, who introduced the 1989 bill, explained:

> In addition to the chilling effect of [attorney-fee awards] on judicial independence, my colleagues in the judicial branch are concerned that this decision will create a new class of Federal litigation against State decisions. State court plaintiffs are placed, in effect, in a position of appealing to the Federal courts to enjoin State court action when they should be in State courts appealing through the State judicial system. This encroachment on the doctrine of federalism destroys comity between the two separate but equal judicial systems. State judges cannot act effectively if their decisions, no matter how closely they are made in keeping with State law, are subject to immediate challenge in the Federal courts.

135 Cong. Rec. S2630–01, at S2705. Similarly, Senator Gorton described the amendment as "essential to fulfill the historic function of judicial immunity to protect the independence of State and Federal

---

**6.** As the sponsor explains:

> My proposed legislation ... does not prohibit the seeking of injunctive relief under 42 U.S.C. [§ ] 1983 against judges, even though Justice Powell argued [in his dissent in *Pulliam* ] that the doctrine of judicial immunity should extend to such actions. Nor on the other hand does it codify that portion of the majority opinion, preferring rather to permit subsequent Court construction on the extent of judicial immunity.
> My bill simply prohibits the award of attorney's fees against judges growing out

> of actions for injunctive relief. As Justice Powell noted in *Pulliam*, there is no difference between monetary damages against a judge and making him personally liable for a plaintiff's attorney's fees. The latter is the same as the former in its effect and would make even the most conscientious judge reticent about making the difficult decisions necessary to discharge his responsibilities.

131 Cong. Rec. E304–02 (1988) (remarks of Sen. Gekas).

courts, and preserve judicial Federalism." *Id.*

Third, there is absolutely no reference to "quasi-judicial" officers anywhere in the legislative history.[7] Rather, "judicial officer" is used interchangeably with "judge," "justice," and "magistrate." *See, e.g.,* S. Rep. 104–366, at 37 (parenthetically describing "judicial officers" as "justices, judges and magistrates"); 134 Cong. Rec. S3802–01 (disapproving of "principle that state judicial officers, *from magistrate to supreme court justice,* even when clearly acting within their jurisdiction, may be subjected to liability for costs and attorney's fees as a result of what is perceived to be their failure to interpret the law 'correctly' "). Indeed, the 1991 report specifically discusses the legislation's focus as being unique to those who preside over litigation:

It is redundant to say that judges are in the business of judging. But it helps to emphasize that *judges are required, more so than most other public officials, to make on a daily basis judgments that directly affect our most precious rights as individuals.* Virtually every case, whether a civil dispute or a criminal prosecution, results in judgments favoring one party over another. *These judgments often affect large groups or classes of people other than the litigants directly involved.*

It follows that judges are at the center of controversy and high emotions in their daily work, but must make dispassionate and objective evaluations of the facts plus reasoned applications of the law if there is to be a just and fair result. A typical judge makes thousands of controversial decisions over the course of even a brief career *on the bench.* Many of these decisions involve difficult factual and legal determinations, often involving *unsettled questions of law or settled questions that can change on appeal.* Judicial immunity, therefore, is not for the protection of the judge but for the protection and integrity of the judicial process. It is essential to the rule of law.

S. Rep. 102–224, at 8 (emphasis added). Even the opponents of amending section 1983 did not contemplate that the new language would restrict injunctive relief against anyone other than judges:

Th[e] proposed limitation would operate to deprive the Federal courts of a vital tool for protecting constitutional rights. Perhaps this intrusion upon the capacity of Federal courts to remedy constitutional violations might be justified if it could be shown that Federal courts were continually overstepping

7. The closest reference to "quasi-judicial" officers comes in the report accompanying the 1991 version in discussing the financial hardships that attorney-fee awards place on state judicial officers:

Even where the State has ultimately paid the fees imposed by these cases, the fact remains that each case that joins a judge places an open-ended financial threat against the judge for making an honest judicial decision for which a governmental unit may not be liable. While such a case is pending, the judge might be unable to buy a house or gain credit for purchase of a car. Such circumstances have a direct impact

on the lives of judges. Moreover, only 20 States protect judges against fee awards by some kind of indemnification or tort claims statute and some of these statutes are limited in their coverage. Only 10 States cover all State employees *including court administrators.* Therefore, *judicial officials* in at least 30 States could be found personally liable for fee awards unless their legislatures acted to protect them.

S. Rep. 102–224, at 9 (emphasis added). At most, this shows that Congress considered the financial impact that amending section 1988 might have on court administrators—judicial-branch employees, even if not actual judges.

their bounds and fashioning *broad injunctions that interfered with the operation of the State judiciary.* Yet no such showing has been made. In the absence of any evidence of widespread abuse in the granting of declaratory and injunctive relief by Federal courts *in civil rights actions against State judges,* there is no justification for [this] drastic restriction.

*Id.* at 14 (emphasis added). And finally, the report accompanying the FCIA describes Congress's specific intent in amending section 1983 "to bar a Federal judge from granting injunctive relief against a State judge, unless declaratory relief is unavailable or the State judge violated a declaratory decree." S. Rep. 104–366, at 37.

In sum, the legislative history demonstrates that Congress did not even consider the issue of quasi-judicial officers when it amended section 1983, much less affirmatively intend to restrict the availability of injunctive relief against them. And we are unwilling to infer from this legislative silence that Congress intended to abrogate the availability of injunctive relief against a state official when entitlement to such protection is neither "well established at common law" nor "compatible with the purposes of the Civil Rights Act." *See Gomez,* 446 U.S. at 639, 100 S.Ct. at 1923 (quotation omitted).

The commissioner's immunity from injunctive relief is not well established at common law. Rather, the well established rule is that "immunity from damages does not ordinarily bar equitable relief as well." *Wood,* 420 U.S. at 314 n. 6, 95 S.Ct. at 997 n. 6. Indeed, although prosecutors have enjoyed absolute quasi-judicial immunity from damages since the early 20th century, they also have been subject to injunctive relief since that time period. *Compare Imbler,* 424 U.S. at 421–22, 96 S.Ct.

at 990–91 (citing *Yaselli v. Goff,* 12 F.2d 396 (2d Cir.1926) (granting federal prosecutor absolute quasi-judicial immunity from damages), *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (per curiam)), *with Young,* 209 U.S. at 159, 28 S.Ct. at 453 (enjoining state attorney general). "Certain immunities were so well established in 1871, when [section] 1983 was enacted, that we presume that Congress would have specifically so provided had it wished to abolish them." *Buckley,* 509 U.S. at 268, 113 S.Ct. at 2613 (quotation omitted). Conversely, the availability of injunctive relief against quasi-judicial officials, despite absolute immunity from damages, is so well established that we presume Congress would have expressly abrogated the availability of injunctive relief against quasi-judicial officials had it intended to do so.

## DECISION

Because extending to the commissioner quasi-judicial immunity from injunctive relief in actions under 42 U.S.C. § 1983, as amended by the Federal Courts Improvement Act of 1996 (FCIA), would be inconsistent with (1) the plain language of the statute and the United States Supreme Court's broad construction of section 1983, (2) the legislative history of the FCIA, and (3) the purpose of section 1983, the district court erred by dismissing Simmons's complaint on this ground.

**Reversed and remanded.**