2012 CO 54

**Ward CHURCHILL, Petitioner**

v.

**The UNIVERSITY OF COLORADO AT BOULDER and Regents of the University of Colorado, a Colorado body corporate, Respondents.**

**No. 11SC25.**

Supreme Court of Colorado, En Banc.

Sept. 10, 2012.

Killmer, Lane & Newman, LLP, David A. Lane, Lauren L. Fontana, Denver, Colorado, Lawlis & Bruce, LLC, Robert J. Bruce, Denver, Colorado, Thomas K. Carberry, Denver, Colorado, The Noble Law Firm, LLC, Antony M. Noble, Lakewood, Colorado, Attorneys for Petitioner.

Office of University Counsel, Patrick T. O'Rourke, Denver, Colorado, Hershey Skinner, LLC, Kari M. Hershey, Denver, Colorado, Attorneys for Respondents.

Brownstein Hyatt Farber Schreck, LLP, Bill C. Berger, Denver, Colorado, Attorneys for Amici Curiae Mountain States Employers Council, Colorado, Association of Commerce & Industry, South Metro Denver Chamber of Commerce, Denver Metro Chamber of Commerce, and Colorado Competitive Council.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Douglas J.

Cox, Senior Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae State of Colorado.

McKenna Long & Aldridge LLP, Lino S. Lipinsky de Orlov, David R. Fine, Mason J. Smith, Denver, Colorado, McKenna Long & Aldridge LLP, C. Randall Nuckolls, Washington, DC, American Council on Education, Ada Meloy, Washington, DC, Attorneys for Amici Curiae American Council on Education, National Association of Independent Colleges and Universities, American Association of State Colleges and Universities, and Association of American Universities.

Deatsch Law Office, Cheri J. Deatsch, Denver, Colorado, National Lawyers Guild, Heidi Elizabeth Boghosian, New York, New York, Attorneys for Amici Curiae National Lawyers Guild, Center for Constitutional Rights, Colorado, Conference of the American Association of University Professors, Latina/o Critical Legal Theory, National Conference of Black Lawyers, Society of American Law Teachers, and Law Professors and Attorneys.

Alan K. Chen, Denver, Colorado, ACLU Foundation, Mark Silverstein, Denver, Colorado, Attorneys for Amici Curiae American Civil Liberties Union and ACLU of Colorado.

Chief Justice BENDER delivered the Opinion of the Court.

¶ 1 In this appeal, we review the court of appeals' opinion in *Churchill v. Univ. of Colo. at Boulder*, —— P.3d ——, 2010 WL 5099682 (Colo.App.2010). The underlying civil action involves claims brought by Professor Ward Churchill pursuant to 42 U.S.C. § 1983 (2011) after his tenured employment was terminated by the Board of Regents of the University of Colorado. Churchill alleges that the Regents violated his constitutionally protected free speech rights by initiating an investigation into his academic integrity and by terminating his tenured employment in retaliation for his publication of a controversial essay. Churchill sought both compensatory and equitable relief. The court of appeals affirmed the trial court's dismissal of Churchill's termination claim on grounds that the Regents' quasi-judicial actions were entitled to absolute immunity. It also affirmed the trial court's dismissal of Churchill's claim for equitable remedies because it concluded that such remedies are not available in a Section 1983 action against quasi-judicial officials. Lastly, based on its determination that allegedly retaliatory employment investigations are not actionable under Section 1983, the court of appeals affirmed the trial court's directed verdict in favor of the University on Churchill's bad faith investigation claim.

¶ 2 We affirm, albeit on slightly different grounds. First, we hold that the Regents' decision to terminate Churchill's employment was a quasi-judicial action functionally comparable to a judicial process. Hence, the Regents are entitled to absolute immunity concerning their decision to terminate Churchill. Second, we hold that the trial court did not abuse its discretion when it ruled that Churchill was not entitled to the equitable remedies of reinstatement and front pay. Third, we hold that Churchill's bad faith investigation claim is barred by qualified immunity because the Regents' investigation into Churchill's academic record does not implicate a clearly established statutory or constitutional right or law. We remand this case to the court of appeals to be returned to the trial court for further proceedings consistent with this opinion.

## I. Facts and Proceedings Below

### Early Events

¶ 3 Churchill was a tenured professor at the University of Colorado at Boulder whose employment could be terminated only for cause. He was also the chair of the University's Ethnic Studies Department. In late January 2005, public furor erupted over an essay that he wrote in the immediate aftermath of the September 11, 2001 terrorist attacks on the World Trade Center in New York City. Among other provocative claims, the essay likened the civilians killed in the World Trade Center to Adolf Eichmann, a Nazi officer and convicted war criminal for his role as the primary planner of the Holocaust. In preparation for a speaking engagement by Churchill at Hamilton College in January 2005, the college's newspaper discovered his essay and publicized its contro-

versial content. Some students organized to protest Churchill's visit. The story and Churchill's essay were subsequently picked up by national media outlets and quickly mushroomed into a national controversy.

¶ 4 In response to the public outcry condemning Churchill's essay, the Regents[1] held a special meeting on February 3, 2005. Before and after the meeting, several of the Regents and Chancellor Phil DiStefano made statements to various media outlets suggesting that they hoped that Churchill would be dismissed as a result of his essay. At the conclusion of the meeting, the Regents unanimously voted to authorize DiStefano to create an ad hoc panel to investigate Churchill's academic works.

¶ 5 After approximately two months, the ad hoc panel reported to DiStefano that the content of Churchill's essay, which it found did not engender imminent violence or unduly interfere with university operations, constituted protected free speech and therefore could not serve as the grounds for a for-cause dismissal of a tenured employee. During this preliminary inquiry, however, the ad hoc panel received several complaints that Churchill had engaged in repeated instances of academic misconduct in his published scholarly writings. In response to those complaints, DiStefano announced that the University would formally investigate Churchill for nine alleged instances of academic misconduct.

## Investigation

¶ 6 DiStefano filed a formal complaint, and the University initiated a formal investigation into the academic integrity of Churchill's scholarship. During the pendency of the investigation, Churchill received his same benefits and pay, retained his tenured status, and was allowed to teach classes and speak openly to the public.

¶ 7 As a result of DiStefano's complaint, the matter was first taken up by the University's Standing Committee on Research Misconduct, a permanent nine-member committee made up of tenured faculty members and charged with policing the academic integrity of the University's faculty. The standing committee then impaneled an inquiry committee to conduct a preliminary review to determine whether the nine allegations had potential merit.

¶ 8 The inquiry committee reviewed Churchill's academic record, interviewed Churchill, and accepted written submissions from Churchill responding to the allegations of academic misconduct. On August 19, 2005, the inquiry committee unanimously ruled that seven of the nine allegations of academic misconduct had merit and should be further investigated.

¶ 9 In response to the inquiry committee's recommendation, the standing committee formed a special investigative committee in January 2006. The investigative committee comprised three tenured faculty members from the University who were not on the standing committee and two tenured faculty members from other universities. The standing committee consulted with Churchill to choose the members of the investigative committee and considered whether any of the potential members had any biases or conflicts of interest. For six months, the investigative committee interviewed witnesses and reviewed hundreds of pages of documents sub-

1. The University of Colorado was established by the Colorado Constitution. Colo. Const. art. VIII, § 5. To govern the University, the Constitution provides: "there shall be nine regents of the [U]niversity of Colorado who shall be elected in the manner prescribed by law for terms of six years each." Colo. Const. art. IX, § 12; *see also Subryan v. Regents of the Univ. of Colo.*, 698 P.2d 1383, 1384 (Colo.App.1984) ("The regents, as a constitutional body, occupy a unique position in our governmental structure."). The Constitution charges the Regents with "the general supervision of [the University of Colorado] and the exclusive control and direction of all funds of and appropriations to [the University]." Colo. Const. art. VIII, § 5. The General Assembly has further clarified these supervisory duties to include the hiring and firing of professors. § 23–20–112(1), C.R.S. (2011) ("The board of regents shall enact laws for the government of the university; appoint the requisite number of professors, tutors, and all other officers; and determine the salaries of such officers.... It shall remove any officer connected with the university when in its judgment the good of the institution requires it."). Pursuant to this constitutional and statutory authority, the Regents have adopted the "Laws of the Regents" as the University's primary governing document.

mitted by Churchill in his defense. The investigative committee unanimously agreed that Churchill engaged in academic misconduct and submitted a 102–page report to the standing committee. Two members recommended that Churchill be suspended for two years, two members recommended that he be suspended for five years, and one member recommended that his tenure be revoked and his employment be terminated.

¶ 10 The standing committee reviewed the investigative committee's report, as well as Churchill's written response to the report. On June 13, 2006, the standing committee issued its own report and recommended sanctions. Six members recommended that Churchill's employment be terminated, two members recommended that he be suspended for five years, and one member recommended that he be suspended for two years. All agreed that Churchill had committed "serious, repeated, and deliberate research misconduct."

### Termination

¶ 11 After receiving the reports from the investigative committee and the standing committee, DiStefano issued a notice of intent to seek Churchill's dismissal. DiStefano alleged that Churchill's "pattern of serious, repeated and deliberate research misconduct falls below minimum standards of professional integrity expected of University faculty and warrants [his] dismissal from the University of Colorado." [2] Churchill requested a formal hearing on the University's intent to terminate his employment, pursuant to section III.A.1 of Regent Policy 5–I. The Facul-

ty Senate Committee on Privilege and Tenure granted Churchill's request and set a hearing in which the University was required to prove that Churchill's academic misconduct fell below the minimum standards of professional integrity by "clear and convincing evidence," as set forth in section III.B.2.o of Regent Policy 5–I.

¶ 12 This faculty senate committee held a seven-day hearing,[3] at which it considered both the evidence against Churchill and the evidence presented by his defense that the entire investigation into his academic record was a pretext to terminate his employment in retaliation for the content of his constitutionally protected free speech. Churchill was represented by an attorney and was afforded an opportunity to present an opening statement, cross-examine adverse witnesses, present expert witnesses, and submit a written closing argument, as mandated by section III.B.2 of Regent Policy 5–I. Pursuant to section III.B.2.m of Regent Policy 5–I, a complete written transcript and a video of the entire hearing were made by a court reporter and a videographer.

¶ 13 On May 3, 2007, the faculty senate committee unanimously concluded that the University had proven by clear and convincing evidence that Churchill's conduct fell below the minimum standards of professional integrity. The committee compiled a report summarizing its findings, which was sent to both Churchill and DiStefano, pursuant to section III.C of Regent Policy 5–I. That report found that Churchill had committed three acts of evidentiary fabrication by gho-

**2.** Article 5.C.1 of the Laws of the Regents sets forth both the grounds and the process for terminating the employment of a tenured member of the University's faculty:

> A faculty member may be dismissed when, in the judgment of the Board of Regents and subject to the Board of Regents constitutional and statutory authority, the good of the [U]niversity requires such action. The grounds for dismissal shall be demonstrable professional incompetence, neglect of duty, insubordination, conviction of a felony or any offense involving moral turpitude upon a plea or verdict of guilty or following a plea of nolo contendere, or sexual harassment or other conduct which falls below minimum standards of professional integrity.

Article 5.C.2(A) specifies that "no member of the faculty shall be dismissed except for cause and after being given an opportunity to be heard." Consistent with these principles, the Regents have adopted "Regent Policy 5–I," which sets forth the proper procedure for the "Faculty Dismissal for Cause Process." Section III.A.1 of Regent Policy 5–I states that the procedure for carrying out a dismissal for cause shall be commenced by the issuance of written notice of an intent to dismiss by the chancellor.

**3.** Section III.B.2.h. of Regent Policy 5–I provides that "[e]xcept in extraordinary circumstances, formal and informal hearings shall be limited to two consecutive days, ordinarily one day for each Party."

stwriting and self-citation, two acts of evidentiary fabrication, two acts of plagiarism, and one act of falsification in his academic writings. It also stated that Churchill failed to prove by clear and convincing evidence that he had been denied adequate due process by the standing committee or that the standing committee's finding was a pretext to punish him for his constitutionally protected free speech. Two members of the faculty senate committee recommended that Churchill's employment be terminated, and three members recommended that he be demoted to associate professor and suspended for one year.

¶ 14 University President Hank Brown reviewed the reports from all three committees: the reports from the investigative committee, the standing committee, and the faculty senate committee. He agreed with the numerous recommendations of committee members who opined that Churchill should be dismissed from the University and forwarded his recommendation that Churchill's employment be terminated to the Board of Regents as required by section I.D of Regent Policy 5–I.

¶ 15 Churchill requested a hearing before the Regents as provided under section IV of Regent Policy 5–I. Before this hearing, Churchill submitted a written argument in his defense. At the hearing, the Regents considered Churchill's written argument; the reports from the investigative committee, the standing committee, and the faculty senate committee; and the recommendation of Brown. Churchill's counsel made numerous arguments in Churchill's defense to the Regents at that hearing. Ultimately, on July 24, 2007, the Regents, by a vote of eight to one, terminated Churchill's employment, describing his conduct as falling below the minimum standards of professional integrity and academic honesty.

¶ 16 Churchill did not seek review of the Regents' decision to terminate his tenured employment in district court, as provided for in C.R.C.P. 106(a)(4).[4]

### Trial

¶ 17 Churchill brought suit in Denver District Court under Section 1983 against the following defendants: the University, the Board of Regents as an official entity, and the individual Regents in both their individual and official capacities. He alleged that the defendants violated his constitutionally protected right to free speech by: (1) initiating an investigation into his academic integrity in retaliation for his controversial but constitutionally protected speech; and (2) terminating his employment because of his controversial but constitutionally protected free speech. Churchill sought economic and non-economic damages as well as equitable remedies in the form of reinstatement of his tenured position and front pay. Front pay is an equitable remedy. It is pay "from the judgment date until reinstatement or, in lieu of reinstatement, until the plaintiff's earning capacity has fully recovered from the effects of [the employer's wrongful act]." *Black v. Waterman*, 83 P.3d 1130, 1133 (Colo.App. 2003).

¶ 18 Prior to trial, the parties agreed to simplify the proceedings by stipulating that the University, as an arm of state government, would waive its state sovereign immunity[5] in exchange for Churchill's dismissal of the Regents as individual defendants in both their individual and official capacities. Under the stipulation, however, the University reserved the right to raise any defenses that may have been available to the Regents in their capacity as individual defendants. One such affirmative defense raised by the University was that the Regents were absolutely immune from suit under Section 1983 because their decision to terminate Churchill's employment amounted to a protected quasi-judicial action. If a party is entitled to immunity, then the case may be dismissed

---

4. Under C.R.C.P. 106(a)(4), a party may seek review of a decision of a "governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions" in district court for an abuse of discretion. Such actions, however, must be filed within thirty days of the lower body's final decision. C.R.C.P. 106(b).

5. *See Alden v. Maine*, 527 U.S. 706, 733–35, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding that under the "structure and history of the Constitution" and consistent with the sovereignty retained by the states, a non-consenting state is immune from private suit).

immediately. Here, however, the parties agreed to preserve the University's claim of quasi-judicial absolute immunity and wait to resolve the issue until after the jury reached a verdict.[6] The full stipulation provided:

> The University agrees and stipulates that it shall waive its immunity to claims for damages under the Eleventh Amendment to the United States Constitution to permit the same recovery from the University that might otherwise be had against any of its officials or employees acting in their official or individual capacities, reserving to the University the ability to present the same defenses that would have been applicable to any of its officials or employees acting in their official or individual capacities.

¶ 19 Pursuant to section 24–10–110(1)(a)–(b), C.R.S. (2011), the University is required to defend and indemnify the Regents for claims arising within the scope of their public office. Thus, the University would have effectively been liable for any judgment against the Regents in this action, irrespective of its Eleventh Amendment sovereign immunity. By agreeing to this stipulation, the parties substantially reduced the complexity of the trial. In the absence of the stipulation, each of the Regents would have been entitled to be represented by separate counsel and any damages would be entered against each individual Regent, subject to indemnification by the University. As the trial court correctly stated, "asserting Eleventh Amendment immunity would not change the parties' ultimate position but would delay Professor Churchill's ability to have his claims resolved in a timely and efficient manner."

¶ 20 Churchill's bad faith investigation claim and termination claim were tried to a jury during a four-week trial. Throughout the trial, Churchill did little to differentiate the two claims and instead maintained that, ever since his controversial essay attracted media attention in 2005, the Regents intend-ed to terminate his employment in retaliation for his protected free speech.

¶ 21 At the conclusion of the evidence, the University moved for a directed verdict on Churchill's bad faith investigation claim, arguing that, under Section 1983, the initiation of an employment investigation and nothing more does not by itself constitute grounds for an actionable claim. Citing federal Section 1983 case law that has adopted standards from federal Title VII discrimination case law, the trial court agreed and ruled that Churchill failed to prove that the University's initiation of the investigation constituted an adverse employment action. The trial court reasoned that the mere initiation of an investigation into Churchill's academic integrity neither changed the terms and conditions of his employment nor deterred other employees from engaging in free speech in the future. Accordingly, the trial court granted the motion for a directed verdict, and Churchill's bad faith investigation claim was not submitted to the jury.

¶ 22 Churchill's termination claim was submitted to the jury with instructions to determine whether Churchill's protected speech was a motivating factor in the Regents' decision to terminate his employment. The trial court also instructed the jury that if it found in Churchill's favor, then it was to determine the appropriate amount of economic and noneconomic damages. Whether Churchill's requested equitable relief, including reinstatement and front pay, was available and appropriate was reserved for the trial judge, as dictated by *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 1000 (10th Cir. 2005) (stating that equitable remedies are awarded by the court and not the jury). After several hours of deliberation, the jury submitted a written question asking the court if it could find in Churchill's favor but nevertheless award him no damages. After consulting with the parties and receiving no objection, the trial court answered with an additional instruction to the jury that stated: "If you find in favor of [Churchill], but do not find any actual damages, you shall none-

---

6. We note that this puts us in the somewhat difficult position of retroactively analyzing whether Churchill's claims could be tried to a jury after a jury has already rendered a verdict in this case. Although we have found no case law forbidding this practice, in general, the interests of judicial efficiency are best served by resolving threshold issues such as immunity prior to trial.

theless award him nominal damages in the sum of one dollar."

¶ 23 The jury deliberated for an additional hour before finding that Churchill's "protected speech [was] a substantial or motivating factor in the decision to discharge" him from his tenured position and that the University had not "shown by a preponderance of the evidence that [Churchill] would have been dismissed for other reasons." In other words, the jury found in Churchill's favor that his employment was terminated in retaliation for his free speech. However, the jury, following the trial court's instruction, found that Churchill suffered no actual economic or noneconomic damages and awarded him nominal damages in the amount of one dollar.

¶ 24 Post-verdict, the University filed a motion for judgment as a matter of law based on its preserved but not yet ruled upon argument that the Regents were absolutely immune from suit on Churchill's termination claim because their decision to terminate Churchill's employment constituted a quasi-judicial act entitled to immunity. Churchill requested that, given the jury verdict in his favor, the trial court order reinstatement to his tenured professorship and grant front pay pursuant to the equitable remedies provided by Section 1983.

¶ 25 The trial court ruled in favor of the University on both motions. Citing federal precedent, the trial court agreed that the Regents' decision to terminate Churchill's employment constituted a protected quasi-judicial action. Thus, the Regents were absolutely immune from Churchill's Section 1983 termination claim. The court vacated the jury verdict, including the award of one dollar.

¶ 26 Addressing Churchill's request for front pay and reinstatement, the trial court ruled that these equitable remedies were not available because Section 1983's bar on equitable remedies against judicial officers applied with equal force to quasi-judicial officers. In the alternative, the trial court ruled that even if equitable remedies were legally permissible in this case, the reinstatement would be inappropriate given that Churchill's relationship with the University was irreparably damaged. The trial court reasoned that reinstatement would likely result in undue interference with the academic process. It would harm the integrity of the University, its faculty, and its students given the fact that Churchill committed numerous instances of academic dishonesty in his scholarship. Lastly, the trial court denied Churchill front pay because the jury found that he had suffered no actual damages as a result of being terminated and that Churchill had failed to mitigate any alleged damages by refusing to seek alternate employment following his dismissal. The trial court rejected Churchill's argument that any alleged academic misconduct was nullified by the jury finding in his favor and instead reasoned that the jury verdict merely meant that the University failed to prove by a preponderance of the evidence that he would have been terminated but for his protected speech. Just because the University used the discovery of Churchill's academic misconduct as a pretext for its violation of his constitutional rights, the trial court reasoned, does not make the findings condemning his lack of academic integrity any less meritorious.

### Appeal

¶ 27 Churchill appealed to the court of appeals, arguing that the trial court erred by: (1) granting the University's motion for directed verdict on his bad faith investigation claim; (2) ruling that the Regents were entitled to quasi-judicial absolute immunity and thus vacating the jury verdict finding in his favor on his termination claim; and (3) ruling that Section 1983 prohibits equitable remedies against quasi-judicial officials.

¶ 28 The court of appeals rejected each of those arguments. First, the court of appeals affirmed the trial court's entry of judgment as a matter of law on the termination claim, relying partly on federal case law and partly on Colorado case law applying C.R.C.P. 106(a)(4) [7] to hold that the Regents' termi-

---

7. C.R.C.P. 106(a)(4), among other things, provides a cause of action for an individual or entity to challenge a decision by "any governmental body or officer or any lower judicial body exer-

nation of Churchill's employment was a quasi-judicial action and thus entitled to absolute immunity. Second, the court of appeals affirmed the trial court's denial of equitable remedies because the trial court's ruling that Section 1983's explicit exemption of judicial officers from equitable remedies applies with equal force to quasi-judicial officers is consistent with the overwhelming majority of courts that have addressed that issue. Third, the court of appeals held that the trial court was correct in entering a directed verdict on Churchill's bad faith investigation claim because under federal case law, an allegedly retaliatory investigation, standing alone, does not constitute an adverse employment action sufficient to establish an actionable claim of employment discrimination under Section 1983.

¶ 29 Churchill petitioned this court to review the court of appeals' decision, reasserting the same three issues, and we granted certiorari.[8]

## II. Analysis

### The Pre–Trial Stipulation

¶ 30 Before analyzing the three issues presented, each of which relates to Churchill's suit against the Regents in their individual capacities, we address as a threshold matter Churchill's arguments with respect to the pre-trial stipulation. Under the stipulation, the University agreed to waive its state sovereign immunity in exchange for Churchill's dropping any and all claims against the Regents in their official and individual capacities and bringing such claims directly against the University. However, in an apparent effort to place the University in the Regents'

shoes, the stipulation also provided that the University could raise any official or individual defenses that could have been asserted by the Regents had they not been dismissed from the case. Churchill argues that the stipulation is significant to our resolution of the present issues in two ways.

¶ 31 Churchill first argues that the court of appeals erred by refusing to address his claims against the Regents in their official capacities (which are now borne by the University pursuant to the stipulation). Churchill contends that because the University waived its state sovereign immunity in the pre-trial stipulation, the University cannot use state sovereign immunity in defending the Regents in his suit against them in their official capacities. We reason otherwise.

¶ 32 A public official may be sued under Section 1983 in both her official capacity and her individual capacity. A suit against a public official in his individual capacity seeks "to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). To defend against a personal suit, a public official may be able to claim either absolute or qualified immunity, otherwise known as personal immunity defenses. *Id.* at 166–67, 105 S.Ct. 3099 ("When it comes to defenses to liability, an official in a personal capacity action may . . . be able to assert personal immunity defenses."). In contrast, a suit against a public official in her official capacity "is, in all respects other than name, to be treated as a suit against the [public] entity." *Id.* at 166, 105 S.Ct. 3099. Personal immunity defenses are unavailable

---

cising judicial or quasi-judicial functions" for an abuse of discretion or a lack of jurisdiction. As discussed below, we have interpreted "quasi-judicial" in the C.R.C.P. 106(a)(4) context more broadly than the federal courts have in defining the scope of quasi-judicial absolute immunity. Accordingly, we resolve the federal question of absolute immunity based only on federal law. *See* note 14, *infra*.

8. We granted certiorari review of the following three issues:

    1. Whether the granting of quasi-judicial immunity to the Regents of the University of Colorado for their termination of a tenured

professor comports with federal law for actions brought under 42 U.S.C. § 1983.

    2. Whether the denial of equitable remedies for termination in violation of the First Amendment undermines the purposes of 42 U.S.C. § 1983.

    3. Whether a public university's investigation of a tenured professor's work product can constitute an adverse employment action for the purposes of a First Amendment claim brought under 42 U.S.C. § 1983 when, as a result of the investigation, the tenured professor also experiences adverse employment action in the form of termination.

when a public official is sued in her official capacity. *See id.* at 167, 105 S.Ct. 3099. Instead, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity ... may possess, such as the Eleventh Amendment [state sovereign immunity]." *Id.* As an arm of the state, the University and its employees in their official capacities are immune from suit under the doctrine of state sovereign immunity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

¶ 33 The plain meaning of the stipulation is unambiguous. The University agreed to "waive its immunity to claims for damages under the Eleventh Amendment to the United States Constitution [state sovereign immunity]." With respect to the Regents, the stipulation stated that the University reserved "the ability to present the same defenses that would have been available to any of its officials or employees acting in their *official or individual capacities.*" (Emphasis added.) Hence, the stipulation provides that although the University agreed to waive its protection as a public entity under the doctrine of state sovereign immunity, the University expressly reserved the right to assert the personal immunity defenses available to the Regents in their individual capacities, including qualified or absolute immunity, as well as the official defenses available to the Regents and the Board of Regents in their official capacities. As established by *Graham* and its progeny, such defenses to claims against public officials in their official capacities include the ability of a public official to invoke the state's sovereign immunity pursuant to the Eleventh Amendment. *Graham,* 473 U.S. at 166–67, 105 S.Ct. 3099 (holding that "the only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment"). As such, this defense was not waived by the stipulation, and Churchill's suit against the Regents in their official capacities was correctly barred by the trial court pursuant to the doctrine of state sovereign immunity. Likewise, Churchill's claims against the Board of Regents as an entity were correctly barred under the doctrine of state sovereign immunity. As an "arm of the [s]tate" (as opposed to a municipal corporation), the Board of Regents is entitled to the same immunities as the state itself. *Doyle,* 429 U.S. at 280, 97 S.Ct. 568. Churchill apparently does not dispute this point.

■ ¶ 34 Churchill's second argument related to the stipulation is that the court of appeals erred in allowing the University, a public entity, to assert the Regents' personal immunity defenses. As explained above, under *Graham,* it is well established that personal immunity defenses are only available to individuals and not government entities. *Graham,* 473 U.S. at 166–67, 105 S.Ct. 3099.

¶ 35 In this case, however, the obvious intent of the stipulation was to place the University in the shoes of the Regents in both their official and individual capacities. Because Colorado law requires the University to defend against and indemnify the Regents for any suits against them arising under the performance of their duties as regents, the parties stipulated to this legal fiction for the sake of simplicity and judicial economy. Under the stipulation, this fiction placed the University in the position to answer for any claims against the Regents but also empowered the University to raise any defenses that would have been available to the Regents prior to their dismissal from the suit. This includes the Regents' ability to defend against the suits against them in their individual capacities by asserting both absolute and qualified immunity. For these reasons, we hold that it was not error for the court of appeals to consider the Regents' personal immunity defenses that were raised by the University in defense of Churchill's claims.

### Qualified and Absolute Immunity

¶ 36 As background to our discussion and analysis of the issues in this case, we set forth the law related to Section 1983 claims and the pertinent immunities that may be raised by public entities and public officials who are sued for such alleged constitutional and civil rights violations.

¶ 37 As briefly discussed, state sovereign immunity shields the state from suit for state actions that violate the rights of an individual. *Alden*, 527 U.S. at 733–35, 119 S.Ct. 2240. However, Congress passed legislation to provide injured plaintiffs with a cause of action against government officials in their individual capacities for actions taken within the course of their public duties that violate the plaintiff's federal statutory or constitutional rights. One such cause of action is a Section 1983 claim, which forms the basis of Churchill's claims here.[9] *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (holding that, in enacting Section 1983, Congress intended to provide a private right of action under federal law to parties deprived of their constitutional rights, privileges, or immunities by an official's abuse of his position) *overruled on other grounds by Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Section 1983 frequently provides redress in the employment context for plaintiffs injured by a public official's retaliation for the plaintiff's protected free speech. *See generally* Martin A. Schwartz, *Section 1983 Litigation Claims and Defenses* § 3.11 (2012) ("First Amendment Retaliation Claims").

¶ 38 The Supreme Court has recognized that public officials, in their individual capacities, may be immune from suits seeking compensatory damages under two distinct common law doctrines of immunity: qualified immunity and absolute immunity. As a threshold matter, if either level of immunity applies, then a public official is completely immune from suit seeking monetary damages. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (holding that the entitlement to both qualified and absolute immunity is "immunity from suit rather than a mere defense to liability") (emphasis omitted).

¶ 39 Qualified immunity applies to a public official's conduct when she takes a discretionary action that a reasonable person would not know violates a clearly established constitutional right of the plaintiff. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (2006) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). In contrast, absolute immunity protects a public official's conduct that violates a plaintiff's constitutional rights even if that conduct was malicious. Although absolute immunity applies to a broader spectrum of conduct, it is available to a narrower class of public officials, those whose special functions or constitutional status requires complete protection from suit. *See Mireles v. Waco*, 502 U.S. 9, 11–13, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). Some public officials, such as judges, prosecutors, and legislators, have been categorically granted absolute immunity when acting within their official capacities. *Imbler v. Pachtman*, 424 U.S. 409, 424–25, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In addition, the doctrine of absolute immunity has also been extended to provide immunity for the quasi-judicial decision-making powers that the legislature or constitution vests in certain administrative officials. *Butz v. Economou*, 438 U.S. 478, 513–14, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (holding that persons performing adjudicatory functions within federal agencies are entitled to absolute immunity from damages liability for their judicial acts).

9. Under Section 1983, Congress has provided individuals with a cause of action against government officials who act in their official capacities to deprive an individual of his statutory or constitutional rights:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

¶ 40 Under Supreme Court precedent, neither absolute nor qualified immunity applies to Section 1983 actions where plaintiffs seek equitable relief.[10] *See Pulliam v. Allen,* 466 U.S. 522, 541–42, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (holding that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity"). However, in 1996, Congress statutorily exempted judicial officers from equitable remedies sought by plaintiffs under Section 1983. Federal Courts Improvement Act of 1996, Pub.L. No. 104–317, § 309(c), 110 Stat. 3847. Although the Supreme Court has held that both judicial officials and certain administrative officials performing quasi-judicial functions are protected by absolute immunity, the Supreme Court has yet to clarify whether Section 1983's exemption for judicial officers from plaintiffs who seek equitable remedies applies with equal force to quasi-judicial officers. *Compare Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (holding that judicial immunity bars claims for equitable relief against officials serving a quasi-judicial function), and *Roth v. King,* 449 F.3d 1272, 1286–87 (D.C.Cir.2006) (holding that judicial immunity from equitable relief extends to quasi-judicial officers), with *Simmons v. Fabian,* 743 N.W.2d 281, 289–91 (Minn.Ct.App.2007) (noting the uncertainty of the issue but holding that judicial immunity from injunctive relief is "indeed restricted to 'judges' ").

### Churchill's Termination Claim

¶ 41 Churchill argues that the court of appeals erred in affirming the trial court's judgment as a matter of law on his termi-

nation claim because it incorrectly held that the Regents in their individual capacities were shielded from suit under quasi-judicial absolute immunity. Churchill contends that the Regents' decision was not functionally comparable to the role of a judge because, he argues, the Regents were biased against him, the Regents were not sufficiently insulated from political pressures, there is no evidence that the decision was based on precedent, and there was no forum in which he could seek independent, rigorous review of their decision.

¶ 42 We review the pertinent federal absolute immunity law and apply it to the facts of Churchill's termination. A judgment as a matter of law presents a purely legal question, which we review de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo. 1995). We ultimately conclude that the Regents are entitled to absolute immunity because their role as quasi-judicial public officials was functionally comparable to the role of a judge.

¶ 43 If a public official's action falls under the auspices of absolute immunity, then the doctrine provides that public official with complete and total immunity from suit, irrespective of how egregious or unlawful the action may have been. *Tobin for Governor v. Ill. State Bd. of Elections,* 268 F.3d 517, 524 (7th Cir.2001) ("Even if [the plaintiff's] suit is meritorious ... it cannot pierce the shield of absolute immunity because judicial officers are entitled to that immunity even when they act in error, maliciously, or in excess of their authority."). Given the harsh result that absolute immuni-

---

10. A damage remedy seeks to make an injured plaintiff whole through an award of damages. Unlike compensation damages, equity seeks remedies such as an injunction or an order for specific performance where monetary damages do not adequately redress the plaintiff's injury. *Black's Law Dictionary* 445, 1408 (9th ed. 2009). Historically, under the common law, equitable remedies were not tried to a jury but could be sought only in a court of equity. In contrast, legal remedies (including compensatory damages) were tried to a jury and could be sought only in a court of law. *Am. Family Mut. Ins. Co. v. DeWitt,* 218 P.3d 318, 322 (Colo.2009).

   Although the courts of law and courts of equity have long since merged, the distinction between

the two types of relief remains: "Merger has not eliminated the difference between law and equity with regard to jury trials. Purely equitable cases are still tried without a jury, while cases at law are constitutionally entitled to a jury." *Id.* This distinction stands because the appropriate amount of compensatory damages typically presents a purely factual question, whereas an award of equitable relief often requires the discretion of a judge to "balance the equities" through consideration of the nature of the plaintiff's claim(s) and any equitable defenses as well as broader policy considerations. Dan B. Dobbs, *Law of Remedies* § 2.4(1) (2d ed. 1993).

ty can have on plaintiffs with legitimate claims, the Supreme Court has applied the doctrine sparingly to include only "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Butz,* 438 U.S. at 507, 98 S.Ct. 2894. "Officials who seek [absolute immunity] have the burden of showing that such an exemption is justified by overriding considerations of public policy." *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

¶ 44 Some officials, such as judges, prosecutors, and legislators, have been categorically granted absolute immunity when acting within their official capacities because, by definition, their positions involve highly discretionary and often politically fraught-decisions that might be compromised if subjected to the constant threat of retaliatory litigation. 4 McQuillin, *The Law of Municipal Corporations* § 12:260 n. 2 (3d ed. 2011) (collecting cases); *see, e.g., Forrester,* 484 U.S. at 226, 108 S.Ct. 538 ("[T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have."). The difficult and important decisions that society asks such officials to undertake "invariably produce[ ] at least one losing party, who would 'accept anything but the soundness of the decision in explanation of the action of the judge.'" *Butz,* 438 U.S. at 509, 98 S.Ct. 2894 (quoting *Bradley v. Fisher,* 80 U.S. (1 Wall.) 335, 348 (1871)). "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949). Absolute immunity, in these contexts, benefits not only the protected official but also society at large. *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

¶ 45 This logic has been extended in some instances to provide absolute immunity to other public officials tasked with quasi-judicial decision-making responsibilities. This is so because, as the Supreme Court has concluded, some quasi-judicial actions are so similar in function to that of the judiciary that the threat of liability for those actions implicates the same concerns: the need to preserve the neutrality of such functions and to protect the officials carrying them out from the constant threat of frivolous litigation for merely doing the job that society has collectively asked them to do. *Butz,* 438 U.S. at 508–14, 98 S.Ct. 2894; *see also id.* at 514, 98 S.Ct. 2894 ("[W]e think that the risk of an unconstitutional act by [a quasi-judicial official] is clearly outweighed by the importance of preserving the independent judgment of these men and women."). Although not categorically protected by absolute immunity in the same way that judges and prosecutors are, officials engaged in quasi-judicial decision-making may be absolutely shielded from liability for acts that are " 'functionally comparable' to that of a judge." *Id.* at 513, 98 S.Ct. 2894.

¶ 46 To assist lower courts in determining whether a public official's quasi-judicial actions "share[ ] enough of the characteristics of the judicial process" to merit absolute immunity, *id.,* the Supreme Court has enumerated a non-exhaustive list of factors:

(a) [T]he need to assure that the individual can perform his functions without harassment or intimidation;

(b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;

(c) insulation from political influence;

(d) the importance of precedent;

(e) the adversary nature of the process; and

(f) the correctability of error on appeal.

*Cleavinger v. Saxner,*[11] 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (summariz-

11. In *Cleavinger,* the Court held that a prison disciplinary review committee was not entitled to absolute immunity because the committee was not sufficiently independent from its supervisor, the warden, or the day-to-day workplace politics present at the correctional institution. *Id.* at

203–04, 106 S.Ct. 496. The Court reasoned that the committee's decisions were not based on a process with sufficient procedural safeguards. *Id.* at 206, 106 S.Ct. 496. The Court was particularly concerned that prisoners appealing a disciplinary decision were not afforded independent

ing the factors set forth in *Butz*,[12] 438 U.S. at 512, 98 S.Ct. 2894). Lower courts have held that these factors are to be applied in a holistic fashion and that the scope of the inquiry is not whether each factor is present but rather whether the balance of all of the factors favors immunity. *See, e.g., Russell v. Town of Buena Vista, Colo.,* No. 10–cv–00862–JLK–KMT, 2011 WL 288453, at *19–20 (D.Colo. Jan.12, 2011) (balancing all six Butz factors to determine that a town's board of trustees was entitled to absolute immunity regarding its decision to remove the town's mayor from office); *see also Disraeli v. Rotunda,* 489 F.3d 628, 631 (5th Cir.2007) (emphasizing that the Butz factors should be applied comprehensively); *Mylett v. Mullican,* 992 F.2d 1347, 1353 (5th Cir.1993) (noting that, when applying the Butz factors, "[n]o one factor is controlling").

¶ 47 We now apply each of these factors [13] to the Regents' administrative and procedural action in terminating Churchill and conclude that—in performing this action—the Regents' termination of Churchill's employment was "functionally comparable" to a judicial action.[14] *Butz,* 438 U.S. at 513, 98 S.Ct. 2894. We analyze each factor in turn. *See Forrester,* 484 U.S. at 224, 108 S.Ct. 538 ("[W]e examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.").

*Need to Protect Against Harassment or Intimidation*

¶ 48 As discussed, a foundational purpose of the doctrine of absolute immunity, and its subsequent extension to administrative actions that are quasi-judicial in nature, is the concern that tough decisions frequently produce sore—often litigious—losers. *See Butz,* 438 U.S. at 512, 98 S.Ct. 2894 ("The loser in one forum will frequently seek another, charging the first with unconstitutional animus."). Allegations of academic misconduct and dishonesty seem especially ripe for creating angry and emotional litigants. *See Gressley v. Deutsch,* 890 F.Supp. 1474, 1491 (D.Wyo.1994); *accord Pierson,* 386 U.S. at 554, 87 S.Ct. 1213 ("It is a judge's duty to decide all cases ..., including controversial

legal counsel and that the prisoners were unable to compel the attendance of witnesses and not allowed to cross-examine adverse witnesses. *Id.* "In sum, the members [of the review committee] had no identification with the judicial process of the kind and depth that has occasioned absolute immunity." *Id.*

**12.** After applying these factors, the Butz Court held that Department of Agriculture hearing officers responsible for setting commodity futures prices are entitled to quasi-judicial absolute immunity because they operate independently from political influence and provide significant process before rendering a decision. 438 U.S. at 512–16, 98 S.Ct. 2894.

**13.** As noted, the six factors first set forth in Butz do not constitute an exhaustive list. *Cleavinger,* 474 U.S. at 202, 106 S.Ct. 496. Neither party, however, directs us to any additional factors to be considered consistent with the policy foundation of the doctrine of quasi-judicial absolute immunity. Thus, we limit our analysis to the Butz factors.

**14.** Although we affirm the court of appeals on this issue, we note our disagreement with the part of its rationale that relied on the term "quasi-judicial" as that term has been defined under Colorado law to determine when judicial review

of an administrative action is available under C.R.C.P. 106(a)(4). *See, e.g., Cherry Hills Resort Dev. Co. v. Cherry Hills Vill.,* 757 P.2d 622, 625 (Colo.1988). For the purpose of determining the application to public officials' immunity, we look to federal case law and not to our decisions construing Rule 106(a)(4).

Rule 106(a)(4) provides for judicial review of administrative decisions "[w]here any governmental body or officer or any lower judicial body exercising judicial or *quasi-judicial* functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law." (Emphasis added.) We have defined the term "quasi-judicial" more broadly to define the scope of Rule 106(a)(4) than the federal courts have to determine when absolute immunity applies. *Compare Kodama v. Johnson,* 786 P.2d 417, 419 (Colo. 1990) (holding that prison disciplinary commission was subject to C.R.C.P. 106(a)(4) review), with *Cleavinger,* 474 U.S. at 201, 106 S.Ct. 496 (holding that prison disciplinary commission was not sufficiently independent to be afforded absolute immunity); *see also Bd. of Cnty. Comm'rs of Douglas Cnty. v. Sundheim,* 926 P.2d 545, 549 (Colo.1996) (holding that procedural rules governing C.R.C.P. 106(a)(4) review are inapplicable to quasi-judicial actions challenged under Section 1983).

cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption.").

¶ 49 The need for freedom from harassment is especially important in the university setting. As the Supreme Court recognized in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), one of the "essential freedoms" of an institution of higher learning is "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 312, 98 S.Ct. 2733 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). This reasoning strongly suggests that the Regents must be granted a certain degree of autonomy in their employment decisions to ensure that they are not forced through litigation to retain a professor who has engaged in repeated instances of academic dishonesty. To hold otherwise could compromise the University's institutional mission and integrity.

### Procedural Safeguards

■ ¶ 50 As set forth in *Cleavinger*, whether an administrative decision contains sufficient "procedural safeguards" is an important factor because it ensures procedural fairness. 474 U.S. at 206, 106 S.Ct. 496. The greater process provided, the more likely that an administrative action will resemble the work of a judge in a courtroom. *See id.* The "procedural safeguards" attendant to an administrative action that can be classified as quasi-judicial include the right to counsel, the ability to cross-examine, the ability to present an opening statement and closing argument, the ability to put on witnesses and present rebuttal evidence, and the adherence to an explicit and predetermined burden of proof. *Id.*

¶ 51 In *Cleavinger*, the Supreme Court rejected a claim of quasi-judicial absolute immunity largely on the grounds that the underlying administrative process neither allowed the aggrieved party to be represented by counsel nor allowed the aggrieved party to compel the attendance of witnesses or to cross-examine adverse witnesses. *Id.* The hearing was not governed by a cognizable burden of proof, and little respect was paid to the rules of evidence. *Id.* Nor was a verbatim transcript of the hearing prepared to facilitate possible review under the federal Administrative Procedure Act. *Id.*

¶ 52 Here, Churchill was afforded significantly more process than that in *Cleavinger*. Over the course of the two-year investigation into the allegations of academic misconduct, Churchill appeared in person and submitted written arguments rebutting the charges against him before no less than five University bodies: (1) the inquiry committee that interviewed Churchill and accepted his written responses to the allegations; (2) the investigative committee that considered hundreds of pages of documents submitted by Churchill in his defense; (3) the standing committee that considered Churchill's written response to the investigative committee's report; (4) the faculty senate committee that conducted Churchill's seven-day hearing; and (5) the Regents who accepted Churchill's written argument and allowed Churchill, through his attorney, to argue his case before them. At each step, Churchill was allowed to and did retain the assistance of able legal counsel.

¶ 53 As required by the Laws of the Regents and Regent Policy 5–I, at the seven-day faculty senate committee hearing, Churchill made an opening statement and closing argument, presented his own witnesses and evidence in his defense, and cross-examined adverse witnesses. Pursuant to Regent Policy 5–I, a written transcript and a video recording were prepared chronicling the complete proceeding, and the faculty senate committee made written findings and recommendations. At the seven-day hearing, the University was required to prove by clear and convincing evidence that Churchill's academic misconduct fell below the minimum standards of professional integrity.

### Insulation from Political Influence

¶ 54 The next Butz factor leads us to consider whether the Regents were truly acting

independently when they decided to terminate Churchill's tenured employment. To balance this factor, we must determine whether the Regents are sufficiently autonomous and free from ongoing political pressures such that their decision is worthy of the respect afforded the judgment of a member of the judiciary, whom our system faithfully presumes to be free from outside influence. *See Butz,* 438 U.S. at 513, 98 S.Ct. 2894.

¶ 55 Churchill argues that the Board of Regents is an inherently political body because each of the nine Regents is elected to a six-year term. Colo. Const. art. IX, § 12. Although Churchill concedes that the Board of Regents is an independent body because it originates from the Colorado Constitution and is not subordinate to either the General Assembly or the governor, he asserts that this direct accountability to the people precludes the Regents from sitting as neutral arbiters. Especially in this case, Churchill argues, where media pressure and popular public opinion had coalesced to cast his scholarship in an intensely negative light, the Regents could not possibly have tuned out the myriad calls for his ousting. Churchill claims that the Regents had no meaningful choice because any action short of dismissal would have resulted in a severe political backlash against the Regents.

¶ 56 Federal courts, however, have looked to much more than whether an administrative body is elected to resolve the potential applicability of absolute immunity. As noted by the federal District Court for the District of Colorado, the label "political influence" that is used to describe this *Butz* factor is "somewhat of a misnomer." *Russell,* 2011 WL 288453, at *16 (reasoning that "for the purposes of immunity analysis, the insulation-from-political-influence factor does not refer to the independence of the government official from the political or electoral process, but instead to the independence of the government official as a decision-maker" (quoting *Brown v. Griesenauer,* 970 F.2d 431, 439 (8th Cir.1992))). Because many states elect their judges through popular vote, whether an administrative body is elected cannot be said to make that body more or less like the

judiciary. *Dotzel v. Ashbridge,* 438 F.3d 320, 326 (3d Cir.2006) ("Whether an official is elected or appointed is not in itself probative of anything at all in the 'acts like a judge' analysis; the devil is always in the details."); *Brown,* 970 F.2d at 439 (noting that both legislators and many state judges are elected by the public but nonetheless enjoy absolute immunity for acts taken in their official capacities). In Colorado, judges are not directly elected but are periodically brought before the electorate in retention elections. Colo. Const. art. VI, § 25. Thus, Churchill's concern that the Regents were impermissibly swayed by fear of retribution in future elections is no different than the political pressure faced by Colorado judges whom we expect to remain neutral and make politically unpopular decisions pursuant to controlling law though they will later face a retention election.

¶ 57 The Board of Regents is unique in our constitutional structure in that it exists independently of both the legislative and executive branches. Colo. Const. art. IX, § 12. This case is readily distinguished from *Cleavinger,* where the Supreme Court rejected the prison disciplinary board's claim of absolute immunity largely because the board was subject to the direction and control of the prison's warden and because the board members were employees of the federal Bureau of Prisons. 474 U.S. at 203–04, 106 S.Ct. 496. In contrast, the Regents are the highest authority in the University of Colorado system and enjoy complete independence to select the president of the University and to dictate the University's policies and programs. Colo. Const. art. IX, § 13; *cf. Purisch v. Tenn. Technological Univ.,* 76 F.3d 1414, 1422 (6th Cir.1996) (rejecting a claim of absolute immunity for university grievance committee because the members of the committee were employees of the university and "subordinates of the university president, who select[ed] the committee's members and review[ed] its decisions").

## Importance of Precedent

¶ 58 Next we consider the extent to which the Regents' decision was guided by precedent and was not purely discretionary. As

evidence that the Regents' actions were substantially discretionary, Churchill points to the fact that DiStefano testified that the Regents' emergency meeting following the initial wave of national publicity in January 2005 was unprecedented. Churchill notes that the Regents failed to provide evidence of similar termination proceedings to show that his termination was in accordance with standard procedure.

¶ 59 These arguments misinterpret this *Butz* factor. Several federal courts that have addressed this factor in depth have concluded that the appropriate inquiry is not whether the allegedly quasi-judicial action was in accordance with prior, similar decisions, but rather whether the decision was constrained by outside law. *Dotzel*, 438 F.3d at 327 (noting that, when assessing the use-of-precedent *Butz* factor, the relevant inquiry is whether the decision is "constrained by outside law"); *see also Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 99 (3d Cir.2011) (reasoning that in instances where the allegedly wrongful administrative action is the first of its kind, courts should simply look to whether the decision was governed by a predetermined procedure and burden of proof). Thus, the appropriate inquiry is not whether the Regents' emergency meeting and ultimate decision to terminate Churchill for academic misconduct were supported by evidence of prior similar acts. Instead, the issue is whether these actions were supported by and consistent with the Laws of the Regents and Regent Policy 5–I.

¶ 60 As detailed above, Regent Policy 5–I provides for a comprehensive procedure before a tenured professor may be terminated for cause. Regent Policy 5–I provides that a tenured professor may request a hearing with the opportunity to be represented by an attorney, present oral argument, cross-examine adverse witnesses, and put on evidence and witnesses to counter the allegations of academic misconduct. Under the policy, a tenured professor cannot be terminated without a finding that his conduct fell below the University's standards of academic integrity by clear and convincing evidence. Adherence to these procedures guarantees that employment decisions of the Regents will not

be purely discretionary. *Dotzel*, 438 F.3d at 327 (holding that, where a board is required by internal policy to issue a written opinion accompanied by findings of fact and conclusions based thereon, "[the] procedure is quintessentially judicial").

*Adversarial Nature of the Proceeding*

¶ 61 Under the Laws of the Regents, the procedure for terminating the employment of a tenured professor is by nature adversarial. *Accord Dotzel*, 438 F.3d at 327 (noting that decisions made by a township's Board of Supervisors are "adversarial as a matter of law"). Regent Policy 5–I, adopted under the authority of the Laws of the Regents, required that Churchill receive notice that the Regents intended to terminate his tenured employment and that he be provided with an opportunity to appear and rebut the allegations against him. Also, as discussed, Churchill was afforded an opportunity to present evidence in his defense and to cross-examine adverse witnesses. "These are hallmarks of adversarial proceedings." *Id.*

*Correctability of Error on Appeal*

¶ 62 Lastly, we consider whether the Regents' decision is without any alternate form of review, such that the application of absolute immunity from Section 1983 would grant the Regents complete impunity from a serious allegation of a constitutional violation. The court of appeals reasoned that such alternate review was available to Churchill under C.R.C.P. 106(a)(4), which provides judicial relief from administrative decisions that lack jurisdiction or constitute an abuse of discretion. Churchill did not seek review pursuant to C.R.C.P. 106(a)(4).

¶ 63 Churchill argues that the court of appeals erred because Rule 106(a)(4) enables a reviewing court to set aside a quasi-judicial administrative decision only if it is found to be arbitrary and capricious. *Widder v. Durango Sch. Dist. No. 9–R*, 85 P.3d 518, 526 (Colo.2004) ("[Rule 106(a)(4) ] does not contemplate a new evidentiary hearing at the district court level, but rather contemplates that the district court will review the record of the proceedings conducted elsewhere and determine whether the acting entity abused

its discretion or exceeded its jurisdiction"). Churchill contends that this standard strongly shifts a presumption of legality in the Regents' favor because all they would need to prove at a C.R.C.P. 106(a)(4) review hearing is that their decision was based on some credible evidence. Thus, Churchill argues, even if he had been terminated solely on the basis of his free speech in violation of the First Amendment, then the Regents' action could survive C.R.C.P. 106(a)(4) review by presenting their pre-textual reason for his termination—alleged academic misconduct.

¶ 64 Although it is true that a lack of evidence is one basis for a court reviewing an administrative decision under C.R.C.P. 106(a)(4) to find that a decision was arbitrary and capricious, it is not the only basis. Relevant here, an administrative decision is per se arbitrary and capricious if it violates a party's constitutional rights. *See Colorado Racing Comm'n v. Smaldone*, 177 Colo. 33, 492 P.2d 619, 620 (1972) (reasoning that the application of an unconstitutional administrative policy necessarily amounts to an abuse of discretion). Even if the record supports a constitutional basis for his termination, appellate review for an abuse of discretion still provides Churchill a meaningful opportunity to argue that the University's stated reason was merely a pretext for an unconstitutional purpose. *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1248 (Colo.2001) ("If the employer meets its burden of producing a legitimate reason for the action, the complainant must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for the adverse employment decision were in fact a pretext for discrimination." (internal quotations omitted)).

¶ 65 Accordingly, if Churchill could establish in a C.R.C.P. 106(a)(4) hearing that one reason for his termination was retaliation for his free speech, a reviewing court would be compelled to reject the Regents' decision as arbitrary and capricious. Thus, Churchill's argument that a holding that the Regents were entitled to absolute immunity from Section 1983 liability grants them carte blanche to violate the First Amendment rights of the University's employees is incor-

rect. Instead, such violations must be policed through the C.R.C.P. 106(a)(4) review process. Although C.R.C.P. 106(a)(4) does not provide for the same remedies in terms of economic damages, it nevertheless ensures that the Regents are not above the law and provides relief from conduct violating the Constitution.

¶ 66 Another basis for setting aside an administrative decision as arbitrary and capricious would be a showing at a C.R.C.P. 106(a)(4) hearing that the administrative decision—makers held some institutional bias or personal grudge against the affected party. *Venard v. Dep't of Corr.*, 72 P.3d 446, 449–50 (Colo.App.2003) (holding that an allegedly biased administrative hearing officer abused her discretion by failing to recuse herself because a decision—maker "must be neutral and detached"). Any appearance of impropriety sufficient to cast doubt on the impartiality of the Regents and the investigating faculty members would be grounds for a reversal of the underlying administrative decision to terminate Churchill's employment. *Id.* at 450. Hence, we conclude that the proper forum for Churchill's continued assertion that the Regents' investigation and ultimate termination of his employment was tainted by the personal animus that many at the University allegedly held against him was in the C.R.C.P. 106(a)(4) context.

### Balance of Factors

¶ 67 On balance, the Butz factors demonstrate that the Regents' termination of Churchill was a quasi-judicial act entitled to protection by absolute immunity. Hence, we hold that the trial court did not err in granting the University's directed verdict and vacating the jury's verdict and award of nominal damages.

### Equitable Relief

¶ 68 Next, we turn to Churchill's argument that irrespective of any immunity held by the Regents, he is nevertheless entitled to equitable relief in the form of reinstatement and front pay under Section 1983, given the jury's finding that his employment

was terminated in retaliation for his controversial essay. The court of appeals held that Section 1983 statutorily exempts quasi-judicial officers from equitable remedies. Thus, given that it had previously held that the Regents' dismissal of Churchill constituted a quasi-judicial action, the court of appeals also held that Churchill could not bring an equitable claim under Section 1983. Churchill argues that even if the Regents' decision was quasi-judicial in nature, the court of appeals erred in applying Section 1983's statutory exemption for judicial officers from equitable remedies to the Regents as quasi-judicial officers. Statutory interpretation is a question of law, which we review de novo. *Granite State Ins. Co. v. Ken Caryl Ranch Master Ass'n*, 183 P.3d 563, 566 (Colo.2008).

■ ¶ 69 Under the common law, judicial officers and qualifying officials performing quasi-judicial functions are absolutely immune from suits seeking monetary damages under Section 1983. *Butz*, 438 U.S. at 513–14, 98 S.Ct. 2894. However, the same is not true of suits seeking equitable or injunctive relief. *Pulliam*, 466 U.S. at 542–43, 104 S.Ct. 1970 (holding that judicial officers are not immune from suits seeking equitable or injunctive relief). In *Pulliam*, the Supreme Court held that common law "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Id.* at 541–42, 104 S.Ct. 1970. Following *Pulliam*, however, Congress amended Section 1983 in 1996 to statutorily exempt judicial officers from equitable suits arising under an alleged Section 1983 violation by a judicial officer. Federal Courts Improvement Act of 1996, Pub.L. No. 104–317, § 309(c), 110 Stat. 3847. Thus, in the absence of common law immunity for judges against equitable relief, Congress erected a statutory protection to preclude the enforcement of Section 1983 against judicial officers on equitable terms. Congress's 1996 amendment to Section 1983 did not, however, clarify whether the exemption from suits seeking equitable relief against judicial officers extends to include quasi-judicial officers in the same manner that judicial absolute immunity has been extended to include certain quasi-judicial actions.

¶ 70 Churchill argues that under the plain meaning of the statute, Section 1983's exemption for judicial officers does not extend to quasi-judicial officers. He claims that even if the Regents are absolutely immune from damages under the common law doctrine of quasi-judicial absolute immunity, then the trial court erred by failing to consider his claim for prospective injunctive relief consistent with *Pulliam*, 466 U.S. at 541–42, 104 S.Ct. 1970 (holding that judicial immunity is not a bar to claims seeking prospective injunctive relief against judicial officers acting in their official capacities). As persuasive authority for his position, Churchill relies heavily on *Simmons v. Fabian*, 743 N.W.2d 281 (Minn.Ct.App.2007). In that case, a division of the Minnesota Court of Appeals considered the legislative history behind the 1996 amendment to Section 1983 and ultimately concluded that "Congress did not even consider the issue of quasi-judicial officers when it amended section 1983, much less affirmatively intend to restrict the availability of injunctive relief against them." *Id.* at 294. Thus, the *Simmons* court held that equitable remedies for Section 1983 violations could be enforced against quasi-judicial officers, irrespective of any common law quasi-judicial absolute immunity from suits seeking monetary damages. *Id.*

¶ 71 On the other hand, the University directs us to the great weight of federal precedent rejecting this reading and holding that quasi-judicial officers are included within Section 1983's exemption for judicial officers from suits in equity. *Pelletier v. Rhode Island*, No. 07–186S, 2008 WL 5062162, at *5–6 (D.R.I. Nov. 26, 2008) (collecting cases from the Second, Sixth, Seventh, Ninth, and D.C. Circuits and noting that *Simmons* is the lone outlier to reach a contrary holding).

¶ 72 Rather than confront this question of federal statutory construction, we resolve this issue by reviewing the trial court's alternative ruling refusing to order Churchill's requested equitable remedies of reinstatement and front pay. The trial court ruled in the alternative to its statutory construction of Section 1983 that Churchill's request for equitable remedies was not justified given the combination of Churchill's academic dishon-

**1008**

esty, the strained relationship between the employer and employee, the jury verdict of one dollar in compensatory damages, and his failure to mitigate his alleged damages.

¶ 73 "The award of equitable relief by way of reinstatement rests in the discretion of the trial court." *Bingman v. Natkin & Co.*, 937 F.2d 553, 558 (10th Cir.1991); *Dobbs, supra* § 2.4(1) (explaining that an award of equitable remedies should be left to the court because it involves a "'balancing' [of] equities, hardships, and the interests of the public and of third persons"). Hence, we review the trial court's denial of both front pay and reinstatement for an abuse of discretion.

¶ 74 A court abuses its discretion only if its decision is "manifestly arbitrary, unreasonable, or unfair." *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 899 (Colo.2008). "In assessing whether a trial court's decision is manifestly unreasonable, arbitrary, or unfair, we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options." *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230–31 (Colo.App.2006). "Accordingly, we do not look to see whether we agree with the trial court." *Hall v. Moreno*, 2012 CO 14, ¶ 54, 270 P.3d 961. Instead, we review the trial court's decision "to ensure that it was based on credible evidence and that it did not 'exceed[ ] the bounds of the rationally available choices.'" *Id.* (quoting *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir.2008)).

¶ 75 In addition, we recognize that to fashion an equitable remedy, however, "a district court is bound both by a jury's explicit findings of fact and those findings that are necessarily implicit in the jury's verdict." *Bartee v. Michelin North America, Inc.*, 374 F.3d 906, 912–13 (10th Cir.2004) ("'[T]he subsequent findings by the trial judge in deciding the equitable claims [cannot] conflict with the jury's [explicit and implicit] determinations.'" (quoting *Ag Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 731 (10th Cir.2000))). When "the jury verdict by necessary implica-

tion reflects the resolution of a common factual issue ... the [trial] court may not ignore that determination." *Ag Servs. of Am., Inc.*, 231 F.3d at 732; *id.* at 730–32 (noting that, when resolving equitable claims, a trial court may not substitute its judgment of the facts for that of the jury).

¶ 76 In its ruling denying reinstatement, the trial court found that the relationship between Churchill and the University was marred by an absence of mutual trust and thus was irretrievably broken. *See Thornton v. Kaplan*, 961 F.Supp. 1433, 1439 (D.Colo.1996) ("In this case, there appears to be a complete absence of mutual trust which would foster collegial relationships and the ability to participate in collaborative projects that are typical in the academic community.") The trial court reasoned that forcing the University to reinstate Churchill would result in a substantial distraction that would negatively impact the University's core mission to educate its students and advance academic and scientific research. In his trial testimony, Churchill stated that he disagreed with the University's standards of scholarship. The trial court found that this made it especially likely that reinstatement would only serve to risk further instances of academic misconduct.

¶ 77 Given that the University committees that investigated Churchill found that he had engaged in repeated, flagrant acts of academic misconduct and dishonesty, the trial court also stated that reinstatement would greatly undermine the University's efforts to hold its students and faculty to the highest standards of personal and academic integrity. Similarly, the trial court reasoned that ordering Churchill's reinstatement would impair the University's ability to ensure that its faculty maintained rigorous levels of academic integrity and would restrict its academic autonomy. Reinstatement might signal to the students and faculty that the University tolerates plagiarism and the fabrication of sources in scholarly work. The trial court also found that reinstatement could tarnish the reputation of the institution generally and the Ethnic Studies Department specifically. Such reputational injuries could make it

more difficult for the University to hire the best faculty and more difficult for graduating students to find employment. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 239, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (stating that an equitable remedy may be partially based on a consideration of the rights of third parties).

¶ 78 Finally, the trial court reasoned that front pay was inappropriate because Churchill failed to show that he had made any attempt to mitigate his lost salary during the period between the termination of his tenured employment and the initiation of the present suit, and the jury determined that he suffered nominal damages of one dollar. *See Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 502 (8th Cir.1998) ("[A] plaintiff must make some sustained minimal attempt to obtain comparable employment.").

¶ 79 We hold that the trial court did not abuse its discretion when it ruled that neither reinstatement nor front pay was appropriate in this case. Its analysis appears well-reasoned and is supported by both credible evidence and analogous federal case law. *See, e.g., Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1576 (10th Cir.1992) ("The [trial] court's decision that a productive and amicable working relationship between the parties was not feasible is supported by the record and hence not an abuse of discretion."). Hence, we affirm the denial of Churchill's request for equitable relief.

### Churchill's Bad Faith Investigation Claim

¶ 80 Lastly, Churchill argues that the court of appeals erred in affirming the trial court's directed verdict in favor of the Regents on his bad faith investigation claim. The trial court granted the directed verdict because it found that the investigation did not constitute an adverse employment action. The court of appeals agreed that it did not constitute an adverse employment action, reasoning that the investigation itself did not result in any change in the terms and conditions of Churchill's employment because during the investigation Churchill retained his tenured position, received his normal pay and benefits, and continued to be allowed to teach classes and to speak openly in public. The court of appeals also affirmed the trial court's ruling on the alternative ground that Churchill's investigation claim was duplicative of his termination claim.

¶ 81 Churchill argues that the court of appeals erred for two reasons. First, Churchill argues that the Regents' investigation constituted an adverse employment action. Second, he contends that the investigation claim is not duplicative of his termination claim, and, thus, the Regents' potential immunity from the termination claim cannot subsume a separate analysis of immunity on his investigation claim. Furthermore, as we have concluded above, the pretrial stipulation preserved the University's ability to raise the Regents' personal immunity defenses, including both qualified and absolute immunity. Therefore, although neither the trial court nor the court of appeals considered it, because it was raised by Churchill and because it is a defense under the pre-trial stipulation, we must first address the threshold issue of immunity before considering whether the investigation constituted an adverse employment action. Even assuming arguendo that Churchill is correct that absolute immunity does not apply because the Regents' investigation did not bear "the hallmarks of quasi-judicial action," we are still left to determine whether qualified immunity protects the Regents' investigation as a discretionary function of a public official. For these reasons, we begin with the question of whether the Regents are entitled to the protection of qualified immunity for their decision to investigate Churchill's academic integrity.

¶ 82 When it applies, qualified immunity shields a public official from liability for discretionary actions taken in her official capacity. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727; *Higgs v. Dist. Court*, 713 P.2d 840, 852 (Colo.1985) ("Qualified immunity, in contrast [to absolute immunity], represents the norm, especially for executive officials."). Like absolute immunity, when it applies, qualified immunity is not merely a defense; it is a threshold issue that bars suit. *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Unlike absolute immunity, however, qualified immu-

nity does not extend to all types of conduct. Under the doctrine of qualified immunity, a public official is shielded from liability only when the conduct in question constitutes an activity that a reasonable person would not know is in violation of a "clearly established" federal statutory or constitutional right or law. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. This standard acknowledges the reality that "[q]ualified immunity balances two important interests the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Thus, although qualified immunity applies to a greater number of public officials than absolute immunity does, it shields a narrower range of those officials' conduct.

■ The Supreme Court has established a two-pronged inquiry to determine whether a public official's action is entitled to qualified immunity. *Id.* at 236–43, 129 S.Ct. 808. Under the first prong, we view the facts in the light most favorable to the plaintiff and look to see whether the allegedly wrongful conduct violated a statutory or constitutional right or law. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The second prong requires us to determine whether that statutory or constitutional right or law was "clearly established" in the context in which the claim arose. *Id.* That is, "whether it would be clear to a reasonable [public official] that his conduct was unlawful

in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). In other words, if we can say that the conduct, irrespective of whether a violation occurred, did not involve a clearly established statutory or constitutional right or law, then we may skip the first prong of the inquiry in the service of judicial economy and constitutional avoidance. *Pearson,* 555 U.S. at 236–43, 129 S.Ct. 808.

Following this optional sequence, our analysis addresses the second prong first. The Supreme Court has not articulated a standard for determining whether a particular type of employment action allegedly taken in retaliation for free speech implicates a clearly established statutory or constitutional right or law in the context of the plaintiff's claim. Hence, we look to the federal courts for guidance and find that they are lacking in clear guidance. There is disagreement about whether an alleged bad faith employment investigation, absent a punitive change in employment status, is adverse and actionable under Section 1983. *Compare Smith v. Fruin,* 28 F.3d 646, 649 n. 3 (7th Cir.1994) ("[E]ven minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures."),[15] with *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.,* 587 F.3d 1223, 1243 (10th Cir. 2009) ("An investigation of potential misconduct ... will generally not constitute an adverse employment action."), *and Carrero v. Robinson,* 05cv–02414, 2007 WL 1655350, at

---

**15.** Churchill directs us to *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), a case in which the Supreme Court held that a governor's policy of refusing to hire or promote low-level public employees who did not share his political affiliation was sufficient to sustain a Section 1983 claim. In reaching this holding, the Court was clear that "deprivations less harsh than dismissal" may trigger First Amendment protection: "Employees who find themselves in dead-end positions due to their political backgrounds are adversely affected. They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder." *Id.* at 73, 75, 110 S.Ct. 2729 (emphasis in original); *see also Belcher v. City of McAlester,* 324 F.3d 1203, 1207–08 & n. 4 (10th

Cir.2003) (holding that a firefighter's phone calls to city council members regarding the potential purchase of a fire truck were on a matter of public concern, as required for First Amendment protection, because "the proposed purchase of [the fire truck] involved the City's tax dollars, and had the potential to impact the safety of the entire community for years to come"); *Levin v. Harleston,* 966 F.2d 85, 89–90 (2d Cir.1992) (holding that the threat of discipline implicit in the actions of a university's president in framing an advisory committee's inquiry into a professor's controversial writings to mirror a contractual standard for disciplinary action created a judicially cognizable chilling effect on the professor's First Amendment rights, even though the president never explicitly stated that formal disciplinary charges would be brought if the professor continued to voice his views).

*10 (D.Colo. June 5, 2007) ("The Court cannot say that an investigation alone constitutes an adverse employment action.... [T]o be adverse, an employment action must be a significant change in employment status." (internal quotation omitted)).[16]

¶ 83 Although we are mindful that a full-fledged, years-long investigation into a professor's academic record taken in bad faith could chill the continued exercise of free speech, we conclude that the federal case law in this area is too unsettled to defeat the Regents' claim of qualified immunity. *See United States v. Lanier*, 520 U.S. 259, 269, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (stating that the existence of "disparate decisions in various Circuits" suggests that a right is not clearly established). Given the uncertainty inherent in this body of federal case law as to whether an allegedly retaliatory employment investigation is actionable under Section 1983, we conclude that a reasonable public official would not know that the initiation of an employment investigation in response to protected speech would be unlawful.[17] *See Harlow*, 457 U.S. at 818, 102 S.Ct. 2727 (holding that a government official performing a quasi-judicial function is shielded from liability for civil damages when she takes a discretionary action that a reasonable person would not know violates a clearly established constitutional right).

¶ 84 Thus, because the second prong of the Supreme Court's two-pronged qualified immunity inquiry cannot be met, the Regents' discretionary decision to launch an investigation into Churchill's academic integrity is shielded by the doctrine of qualified immunity, and we need not reach the issue of whether their investigation constituted an adverse employment action. *See Butz*, 438 U.S. at 506–07, 98 S.Ct. 2894 (holding that a public official performing a quasi-judicial function is shielded by the doctrine of qualified immunity unless that official knows or should know that he is acting outside the law). Hence, on slightly different grounds, we conclude that the court of appeals was correct to hold that the trial court did not err in granting the Regents' motion for a directed verdict on Churchill's bad faith investigation claim.[18]

## III. Conclusion

¶ 85 For the foregoing reasons, we hold that the court of appeals did not err in

---

**16.** The rationale that an allegedly retaliatory employment investigation, absent a punitive change in employment status, is neither adverse nor actionable under Section 1983 was expounded upon by the Fifth Circuit in *Breaux*. *See, e.g., Breaux v. City of Garland*, 205 F.3d 150, 157–58 (5th Cir.2000). The *Breaux* court reasoned that only significant changes in employment status are actionable under Section 1983 because to hold otherwise would "enmesh federal courts in 'relatively trivial matters.'" 205 F.3d at 157 (quoting *Dorsett v. Bd. of Trs.*, 940 F.2d 121, 123 (5th Cir.1991)). The court reasoned that this was consistent with the practice of other federal courts, which have consistently dismissed Section 1983 claims based on trivial employment actions such as nominal reassignment of duties, alterations in administrative procedure, delays in pay raises, professional criticism, requests for psychological testing, and false accusations. *Id.* at 157–58 (collecting cases). Although such administrative actions are understandably " 'extremely important to the person who dedicated his or her life to [public employment],' " such actions are not serious enough to " 'rise to the level of a constitutional deprivation.' " *Id.* at 157 (quoting *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir.1997)); *see also Pierce v. Tex. Dep't of Criminal Justice*, 37 F.3d 1146, 1150 (5th Cir.

1994) (holding that the actions of an employer in requiring a prison corrections officer to take a polygraph examination after she reported a relationship between a female officer and a male inmate did not constitute an adverse employment action for purposes of the First Amendment because no adverse result occurred).

**17.** Indeed, this uncertainty is highlighted by the court of appeals' opinion, which ably attempts to reconcile this confusing and arguably contradictory case law. *Churchill*, 2010 WL 5099682, at *18 ("Whether an investigation alone is sufficient to constitute an adverse employment action has not been resolved by the United States Supreme Court, and there does not appear to be a definitive consensus on the matter among federal courts.").

**18.** Because we conclude that the doctrine of qualified immunity shields the Regents from Churchill's bad faith investigation claim, it is unnecessary for us to reach the issue of whether a Section 1983 claim can be brought solely concerning the initiation of an allegedly bad faith investigation, nor do we need to reach the question of whether the Regents' initiation of the investigation was not retaliatory, as urged by the University.

affirming the trial court's actions in (1) directing a verdict in favor of the Regents on Churchill's bad faith investigation claim; (2) ruling that Churchill's termination claim was barred by the Regents' quasi-judicial absolute immunity; and (3) denying equitable relief under Section 1983 for either claim. Hence, the judgment is affirmed.

Justice EID and Justice MÁRQUEZ do not participate.